[No. D060039. Fourth Dist., Div. One. Mar. 5, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
ERIC RUSSELL ANDREASEN, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication
with the exception of Discussion parts I.A., B., II.A., and III.

## COUNSEL

Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HALLER, J.**—Eric Russell Andreasen appeals from a judgment convicting him of first degree murder, with a special circumstance finding of murder during the commission of attempted robbery. At trial, defendant disputed that he was engaged in a robbery at the time of the killing, and also raised a plea of not guilty by reason of insanity.

On appeal, defendant argues the guilt phase judgment must be reversed because (1) the trial court abused its discretion in admitting prior misconduct

evidence, (2) there was insufficient evidence of attempted robbery to support the special circumstance finding of murder during an attempted robbery, and (3) the felony-murder special-circumstance enhancement, which imposes a sentence of life without the possibility of parole, is unconstitutionally vague. Defendant also argues the sanity phase judgment must be reversed because the trial court erred by (1) instructing the jury that he refused to be examined by the prosecution's retained mental health expert and (2) admitting into evidence statements he made to the police after he asserted his *Miranda*[1] rights. As to sentencing, defendant asserts the court erred in imposing a parole revocation restitution fine.

In the published portion of this opinion, we reject defendant's vagueness challenge to the felony-murder special-circumstance enhancement, and his claim of a *Miranda* violation. In the unpublished portion of this opinion, we find no error concerning the admission of the prior misconduct evidence, the sufficiency of the evidence of attempted robbery, and the instruction concerning refusal to submit to an examination. We agree the parole revocation restitution fine must be stricken, and modify the judgment accordingly. As so modified, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 3, 2009, defendant approached victim Katherine Parker in a shopping center parking lot, engaged in an altercation with her, and fatally stabbed her. Several witnesses testified at trial about their observations.

Christine Moring testified that about 4:00 p.m. on April 3, 2009, she saw defendant in the parking lot approaching a man and talking to him. She had an uncomfortable feeling about the defendant's interaction with the man. While she was putting her shopping cart in the cart rack, Moring saw defendant pacing near her car and look inside her car. Moring had left her purse inside her car and the driver's door open, so she ran to her car and slammed the door shut. Defendant looked at her and said in an angry voice, " 'All I wanted was some change,' " and he then "stormed off."

After leaving Moring, defendant assaulted victim Parker in a nearby area of the parking lot. Moring, who observed the incident, testified that as she was preparing to drive out of her parking space, she saw defendant "jump" onto Parker and his hand "going up and down . . . ." As she drove closer, she saw defendant wrestling with Parker, "moving her around a little bit." She then saw him holding her up from around her waist with one of his hands, and she saw his other hand moving repeatedly in an up-and-down motion.

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

The assault was also witnessed by Kerry and Julie Kusiak. Mr. Kusiak testified that while he was driving in the parking lot, he saw defendant and Parker pushing and yelling at each other. They were facing each other and "kind of struggling with their arms." It appeared as if they were "struggl[ing] over something" and as if Parker was trying to pull away from defendant. Parker was pushed sideways, and then defendant came around from behind her and started stabbing her.

Mrs. Kusiak testified she first heard "[l]oud, out of control, scared, female" screaming. When they drove closer, she saw Parker slightly bent over, struggling with defendant, and clutching her purse in front of her. Defendant's arms were around Parker; he appeared to be punching her and making reaching motions towards where she was holding her purse.[2] When defendant initially struck Parker in the abdomen, Parker remained standing, "kind of hunched over" and still holding her purse in front of her.

As the attack was occurring, Moring and Mr. Kusiak started honking their horns, and people began coming out of the stores. Witnesses saw Parker slump over and drop to the ground. Defendant then stepped back, threw the knife across the parking lot, dropped to the ground, and stayed there until the police came and arrested him.[3]

Other witnesses arrived at the scene after Parker was lying on the ground. Parker was in extreme pain, but was initially conscious. Marisa Diaz-Waian sat down next to Parker and put Parker's head in Diaz-Waian's lap. Parker was clutching her purse with one of her hands, and Diaz-Waian had to take Parker's hand off of the purse to try to hold her hand. Brenda Moser (a nurse) testified that Parker was tightly clutching her purse; Parker would not let go of it when Moser tried to take it from her; and Moser had to ask Parker a couple of times if she would release the purse so Moser could get her identification. In addition to seeing severe wounds to her face and abdomen, Moser noticed that Parker had several slash wounds to her hands.

When the paramedics arrived, Parker was in critical condition and bleeding heavily. She lost consciousness and died before she could be transported to the hospital. She suffered cuts on her face, neck, chest, abdomen, and hands, and as a result of her wounds bled to death. Her injuries included a deep cut from her mouth to her cheek area; a deep cut across her neck that severed her

---

[2] Mrs. Kusiak never saw defendant actually grab Parker's purse.

[3] When defendant stopped stabbing Parker, Moring saw him make a bowing motion and kneel down on his hands and knees, with his arms forward and his head down. Other witnesses saw him lying on the ground on his stomach. He was mumbling, screaming, and shouting, saying he had been to jail or prison before where he was raped; he was a rapist and sex offender; and God sent him to do this.

jugular vein; stab wounds to her abdomen that caused her intestines to protrude; and cuts on her fingers, palm, and side of her hands.

*Uncharged Misconduct Evidence*

To support that defendant killed Parker while he was attempting to commit a robbery, the prosecution presented evidence of an offense he committed in 2004 which involved panhandling and assault, and several incidents when he engaged in aggressive panhandling shortly before the April 2009 stabbing.

Ricardo Hernandez described the 2004 offense when defendant and another man demanded money from him and then assaulted him. Hernandez testified defendant "asked for some change." When Hernandez said he did not have any, defendant argued with him in an angry, loud voice, saying that Hernandez was lying and he did have money. As Hernandez started walking away, defendant kept arguing with him. Defendant's companion then ran up and "took a swing" at Hernandez. Hernandez and the companion fell to the ground, and defendant jumped on top of Hernandez and started hitting him. Hernandez was trying to "duck and cover" himself as the men were hitting him. The men eventually stopped and left Hernandez on the ground without taking any property from him.

The aggressive panhandling incidents included an altercation about nine days before the stabbing near defendant's home; two altercations at the same shopping center as the stabbing (the first incident occurring four days before the stabbing, and the second one occurring the day before the stabbing); and an altercation on the morning of the stabbing at a shop across the street from the shopping center.

Christine Carlino, who lived next door to defendant, testified that in January 2009 she and her husband encountered defendant around 9:00 p.m. while they were walking their dog. Defendant was rambling "on and on" about how he needed money, and Carlino's husband told defendant he should go home. A few months later, on about March 24 or 25, defendant came up to Carlino about 6:00 a.m. when she was getting her newspaper from the driveway. Defendant demanded money from her in an aggressive, "scary" manner, saying " 'I need some money, you have to give me some money.' " Carlino felt frightened, explaining that defendant "appeared out of nowhere"; he was "towering over" her; and he was using a "very deep," "booming" voice. Carlino's dog had run out of the house and was barking and circling around defendant's feet. While defendant was still talking, Carlino grabbed her dog and ran back into her house.

Marilyn Finley testified that about March 30, 2009, defendant approached her while she was in her car in the shopping center's parking lot.

The car window was down and her small dog was hanging out the window. Defendant asked her for money, and when Finley told him she did not have any, defendant said, " 'How would you like it if I break your dog's neck?' " Finley, who was "bewildered" and "shock[ed]," said " 'Are you kidding?' " and " 'I don't believe so.' " Defendant then walked away.

Natalie Brown testified that on April 2, 2009, while she was outside smoking during a break from her job at the shopping center, defendant approached her and asked if she had any change. After Brown looked in her wallet and said she did not have any, defendant asked for a cigarette. Brown gave him one, but defendant became agitated and angrily yelled at her: " 'No . . . . I want more. . . . [¶] . . . [¶] Give me some damn money.' " Brown was shocked and startled and thought he was being rude, so she yelled back at him: " 'Get away from me, I'm not giving you anything else.' " One of Brown's coworkers then walked over, and defendant left.

About 8:00 a.m. on April 3, 2009, Frances Lotito was at a bagel shop across the street from the shopping center where the stabbing occurred. Defendant approached her as she was getting out of her car and asked for money. When she told him she did not have any, he became very agitated and said, " 'You're lying. You're lying. Give me some money.' " She told him she would if she had some, but she did not have any. She walked around her car and grabbed her purse from the passenger's side of the car. Defendant cornered her next to her car and said, " 'You're lying to me. You look like a rich woman. Give me some money.' " She told him she was sorry but she did not have any money, and quickly went into the bagel shop. He followed her into the shop, leaned up against the counter with his arms crossed, and glared at her. She asked the bagel shop employee to call the police, but the employee did not do so. Lotito then saw defendant talking to some other people, who handed him something, and he then left. Lotito testified she felt very frightened during the incident.

*Guilt Phase Verdict*

Defendant was tried for first degree murder on a premeditated murder theory and/or felony-murder theory (based on attempted robbery). The jury convicted him of first degree murder, found that he personally used a deadly or dangerous weapon (a knife) during the murder, and found true the special circumstance that he committed the murder during an attempted robbery. After the jury's verdict, defendant admitted that he had incurred a strike prior conviction, prior serious felony conviction, and prior prison term.

*Sanity Phase*

To assist with the determination of the sanity issue, defendant's mental state was evaluated by two court-appointed experts (Drs. David Naimark and Glenn Lipson) and by an expert retained by the prosecution (Dr. Park Dietz). Defendant was personally interviewed by the two court-appointed experts; however, he refused to be interviewed by the prosecutor's retained expert, Dr. Dietz. The experts reviewed numerous materials relevant to the sanity issue, including police and medical reports related to the offense; videotapes of defendant at the police station after the offense; statements defendant made to his mother and Dr. Naimark concerning the offense; and defendant's criminal and mental health history.

Drs. Dietz and Naimark testified for the prosecution and Dr. Lipson testified for the defense. The experts agreed that defendant suffered from schizophrenia and had a history of delusional behavior, including being naked in public and claiming to be Jesus. Drs. Dietz and Naimark opined that notwithstanding his mental illness, defendant understood the nature and quality of his act and the difference between right and wrong at the time of the offense. In support, the prosecution's experts cited such factors as defendant's carrying of a concealed fixed-blade knife; his goal-directed panhandling before the offense; his conduct reflecting he was motivated by anger and a desire for money; his postoffense conduct suggesting he knew he would be arrested; his statements to the police during a videotaped interview giving examples of matters he perceived as wrongful and reflecting that he was not "grossly psychotic"; and his statements to his mother and Dr. Naimark referring to the victim as an "unlucky" person and indicating he committed the offense to get attention from people he perceived as having wronged him.

Testifying on behalf of the defense, Dr. Lipson explained that in his written report he had concluded defendant did not fully appreciate the nature and quality of his actions and did not have the ability to tell right from wrong. Dr. Lipson opined that defendant made statements and exhibited conduct indicating he experienced delusions; a video of defendant in a holding cell after his arrest (before he was interviewed by the police) showed he was suffering from psychosis; and defendant would not have reacted as violently as he had if not for his delusions. However, Dr. Lipson testified that ultimately he rendered a "soft opinion" on the sanity issue because there were factors that could support both sanity and insanity and he was not able to conclude "100 percent" that defendant was insane.

*Sanity Phase Verdict and Sentence*

At the conclusion of the sanity phase of the trial, the jury found defendant was sane at the time he committed the offense.

Based on the special circumstance finding of murder during an attempted robbery, defendant was sentenced to life without the possibility of parole. He also received a seven-year determinate sentence based on the enhancements for personal use of a deadly weapon, the serious felony prior, and the prior prison term.

## DISCUSSION

### I. *Guilt Phase Arguments*

A., B.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### C. *Vagueness Challenge to Special Circumstance Enhancement for Murder During Attempted Robbery*

Defendant argues the special circumstance enhancement, which imposes a sentence of death or of life *without* the possibility of parole for a murder committed during a felony, is unconstitutionally vague. He contends that as applied to the actual perpetrator of the killing (who need not have the intent to kill), the special circumstance is indistinguishable from the felony-murder offense, which imposes a life sentence *with* the possibility of parole when there is no special circumstance finding. Defendant posits this creates a constitutional infirmity because the prosecutor had "unfettered discretion" to select the charge, and defendant had no way of anticipating whether he would be subjected to the possibility of death or life in prison without the possibility of parole, rather than life with the possibility of parole.

A defendant may raise a substantive due process challenge based on a vague statute that fails to provide reasonable notice or creates a danger of arbitrary application. (*Williams v. Garcetti* (1993) 5 Cal.4th 561, 567–568, 575 [20 Cal.Rptr.2d 341, 853 P.2d 507]; *People v. Superior Court (Bradway)* (2003) 105 Cal.App.4th 297, 309–311 [129 Cal.Rptr.2d 324] (*Bradway*); *Houston v. Roe* (9th Cir. 1999) 177 F.3d 901, 907.) To pass constitutional muster, a statute must be definite enough to provide notice about what conduct is prohibited, and to provide standards for its application and

---

*See footnote, *ante*, page 70.

adjudication to avoid arbitrary and discriminatory enforcement. (*Williams, supra*, 5 Cal.4th at pp. 567–568, 575.)

 Section 189 imposes culpability for first degree murder when a killing is committed during the commission or attempted commission of a statutorily enumerated felony. (*People v. Farley* (2009) 46 Cal.4th 1053, 1111, fn. 17, 1117–1118 [96 Cal.Rptr.3d 191, 210 P.3d 361]; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1140 [124 Cal.Rptr.2d 373, 52 P.3d 572].) Section 190 provides that first degree murder "shall be punished by death, imprisonment in the state prison for life without the possibility of parole, or imprisonment in the state prison for a term of 25 years to life," with the penalty to be determined as provided by certain statutory provisions, including the felony-murder special-circumstance statute (§ 190.2). Once the jury finds the defendant has committed first degree murder, the felony-murder special circumstance applies if the murder was committed during the commission or attempted commission of a statutorily enumerated felony, and subjects the defendant to a sentence of death or of life without the possibility of parole. (§ 190.2, subd. (a)(17).)

These statutes provided defendant with notice that if he commits a statutorily specified felony and kills someone during that felony, he could be subjected to a sentence of 25 years to life with the possibility of parole, life without parole, or death. Defendant had notice as to the proscribed conduct and potential punishment. The mere fact that the prosecution has discretion to select which punishment it will seek does not render a statute unconstitutionally vague or create an improper risk of arbitrary enforcement of a criminal statute. (See *People v. Earp* (1999) 20 Cal.4th 826, 905 [85 Cal.Rptr.2d 857, 978 P.2d 15]; *Bradway, supra*, 105 Cal.App.4th at pp. 310–311; *People v. Keenan* (1988) 46 Cal.3d 478, 506 [250 Cal.Rptr. 550, 758 P.2d 1081] ["By acceptably narrowing the circumstances under which capital punishment may be sought and imposed, such a law satisfies the constitutional prohibition against arbitrary and capricious exaction of the death penalty."].)

Moreover, even assuming arguendo that constitutional due process requires a distinction between the felony-murder offense and the felony-murder special circumstance (see *People v. Gutierrez, supra*, 28 Cal.4th at pp. 1148–1149; *Bradway, supra*, 105 Cal.App.4th at pp. 309–310; *Houston v. Roe, supra*, 177 F.3d at p. 907), there is such a distinction. As we shall explain, the felony-murder offense is established merely upon a showing that the defendant killed during the commission or attempted commission of the felony, whereas the felony-murder special circumstance requires an additional showing that the intent to commit the felony was independent of the killing.

The purpose of the felony-murder rule "is to deter those who commit the enumerated felonies from killing by holding them strictly responsible for any

killing . . . , whether intentional, negligent, or accidental, during the perpetration or attempted perpetration of the felony." (*People v. Cavitt* (2004) 33 Cal.4th 187, 197 [14 Cal.Rptr.3d 281, 91 P.3d 222].) To effectuate this purpose, when a killing occurs during the defendant's commission or attempted commission of one of the felonies listed in the felony-murder statute, the offense of first degree murder is committed without "the need to plumb the parties' peculiar intent with respect to a killing committed during the perpetration of the felony." (*Id.* at pp. 197–198; see *People v. Gutierrez, supra,* 28 Cal.4th at p. 1140 [the mental state for felony murder is simply the intent to commit the underlying felony].)

There is no requirement of intent to kill for either the felony-murder offense or the robbery-felony-murder special circumstance (unless the special circumstance is applied to an aider and abettor). (§ 190.2, subds. (b), (c); *People v. Gutierrez, supra,* 28 Cal.4th at pp. 1140–1141; *People v. Earp, supra,* 20 Cal.4th at p. 905; *People v. Anderson* (1987) 43 Cal.3d 1104, 1138–1139, 1142, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306].) The courts have repeatedly rejected constitutional challenges to the imposition of the special circumstance punishment on the direct killer, even though the statute can operate to punish a felony murderer who kills unintentionally more harshly than a simple murderer who kills intentionally. (See *People v. Anderson, supra,* at pp. 1146–1147; *People v. Earp, supra,* at p. 905 [" 'the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state . . .' "]; *People v. Taylor* (2010) 48 Cal.4th 574, 661 [108 Cal.Rptr.3d 87, 229 P.3d 12].)

██ However, the courts have fashioned the rule that the felony-murder special-circumstance statute can apply only if the murderer had a *felonious purpose independent of, or concurrent with, the murder.* (*People v. Riccardi* (2012) 54 Cal.4th 758, 836 [144 Cal.Rptr.3d 84, 281 P.3d 1]; *People v. Davis* (2009) 46 Cal.4th 539, 609 [94 Cal.Rptr.3d 322, 208 P.3d 78]; *People v. Horning* (2004) 34 Cal.4th 871, 907–908 [22 Cal.Rptr.3d 305, 102 P.3d 228].) That is, the felony-murder special circumstance applies "when the murder occurs during the commission of the felony, not when the felony occurs during the commission of a murder." (*People v. Mendoza* (2000) 24 Cal.4th 130, 182 [99 Cal.Rptr.2d 485, 6 P.3d 150].) If the defendant committed the felony for the sole purpose of effectuating the killing, the felony-murder special circumstance does not apply. (*People v. Riccardi, supra,* at pp. 836–837 [special circumstance inapplicable if defendant committed burglary with sole purpose of killing victim]; *People v. Mendoza, supra,* at p. 183 [special circumstance applicable only if defendant had purpose for arson apart from murder].)

Consistent with these principles, the jury was instructed that to find the felony-murder special circumstance true, "the People must prove that the defendant intended to commit Robbery independent of the killing. If you find that the defendant only intended to commit murder and the commission of Robbery was merely part of or incidental to the commission of that murder, then the special circumstance has not been proved." (See CALCRIM No. 730.) In contrast, the instructions on the felony-murder offense did not include a requirement that defendant's intent to rob be independent of the killing. (See CALCRIM No. 540A.)[7]

Assuming due process requires a distinction between the felony-murder offense and special circumstance, the independent-felonious-purpose requirement applied to the special circumstance provides this differentiation.

Defendant's constitutional vagueness challenge is unavailing.

## II. Sanity Phase Arguments

### A. Instruction that Defendant Refused Examination by Prosecution's Retained Expert*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### B. Admission of Defendant's Statements to Police

Defendant argues the trial court erred by allowing the prosecution to rebut his insanity defense with evidence based on his videotaped statements to the police after he invoked his Miranda rights.

As we shall delineate below, a video of defendant in a holding cell shortly after his arrest shows that he was acting in a highly agitated, angry,

---

[7] We note that, for felony murder, the California Supreme Court has at times stated the felony must not be merely incidental to the killing. (See, e.g., People v. Elliot (2005) 37 Cal.4th 453, 469, 475 [35 Cal.Rptr.3d 759, 122 P.3d 968].) However, this principle does not appear to have been developed as a distinct requirement akin to the independent-felonious-purpose rule applied to the felony-murder special circumstance. (See, e.g., People v. Lindberg (2008) 45 Cal.4th 1, 26–27, 33 [82 Cal.Rptr.3d 323, 190 P.3d 664].) Also, an independent-felonious-purpose requirement applied by the courts (under the merger doctrine) to felonies that involve only an intent to assault has recently been prospectively overruled by the California Supreme Court for purposes of the felony-murder statute. (People v. Farley, supra, 46 Cal.4th at pp. 1113–1114, 1117–1122 [disapproving rule that precluded application of felony-murder statute to case where killing occurred during burglary with intent to assault, absent other burglarious intent]; see People v. Riccardi, supra, 54 Cal.4th at p. 836, fn. 37.) The Farley decision confirms that the independent-felonious-purpose requirement is confined to the special circumstance and it does not extend to the felony-murder offense.

*See footnote, ante, page 70.

delusional manner. He eventually calmed down, was briefly interviewed by the police, asserted his *Miranda* rights, and then was held in a room pending the arrival of forensic personnel. To support its theory that defendant was rational and hence sane at the time of the offense, the prosecution introduced the videotape of defendant's conversations with the officers who were guarding him while waiting for the forensic personnel. To rebut this evidence, the defense introduced the earlier holding cell videotape of defendant in an agitated, delusional state.

On appeal, defendant raises a *Miranda* challenge to the admissibility of the videotaped conversation between him and the guarding officers while awaiting the forensic personnel.

*Background*

During pretrial motions, the prosecutor moved to admit, in the sanity phase of the trial, defendant's videotaped statements to the police while he was being guarded in a room at the police station about three hours after his arrest. Defendant was in the room for about one and one-half hours while awaiting the arrival of an evidence technician and a phlebotomist prior to transport to the jail. Defense counsel objected to the evidence on the grounds that defendant had invoked his *Miranda* rights and all police questioning should have ceased.

*The Videotaped Statements*

To assist in the determination of the *Miranda* issue, the trial court reviewed the videotape and a transcript of the conversations between defendant and the guarding officers. We have also reviewed these materials on appeal.[8] The videotape shows that while defendant was seated on a chair in the room at the police station, a detective provided the *Miranda* advisements and defendant stated he understood them and he might answer "two or three simple questions." The detective then asked defendant if he knew the difference between right and wrong. In response, defendant stated it was "in perspective," for example, not putting people in jail was right, and torturing someone, male homosexuality, and lesbian marriage were wrong. After a short exchange on this subject, defendant said he did not want to answer any more questions, and the detective ceased the questioning and left the room.[9] Before leaving, the detective told defendant he would get him some water

---

[8] We also viewed the earlier holding cell video, which was introduced at trial but was apparently not introduced during the pretrial hearing on the *Miranda* motion.

[9] At some point defendant also apparently made reference to seeing an attorney. The *Miranda* invocations were redacted from the video shown to the jury and are not part of the record on appeal.

and try to get him some food, and while he was gone defendant should "stay cooperative" with the detective's partner.

While the detective was gone, defendant remained seated in the room, restrained with wrist and waist chains, and watched by a security officer and a police officer who were seated several feet from defendant. In soft, conversational tones, the two officers asked questions and talked with defendant about such matters as his tattoos, sports, his talent as a musician and music he liked, his inability to sleep, his gambling and betting activity, where he grew up, activities in Las Vegas, car racing, record stores in the area, and his pets.

The detective intermittently returned to the room, during which time he discussed defendant's request for medication; explained to defendant that they needed to change his clothes and draw his blood before they could transport him; asked if defendant would cooperate when they removed his restraints to change his clothes; and (in response to defendant's expressed concern about needles) promised to stand next to defendant during the blood draw. When the evidence technician arrived at the room, the technician photographed defendant and took his clothes as evidence. When the phlebotomist arrived, the detective again returned to the room and, as promised, stood near defendant during the blood draw procedure.

In the early stages of the waiting period in the room, the conversations between defendant and the two officers guarding him were interspersed with short periods of silence where no conversation occurred. As the waiting time continued, there were extended periods of silence during which no one was talking to defendant. During the course of the time in the room, the officers repeatedly thanked defendant for his cooperation, particularly when they removed his restraints to change his clothes. They also gave him water and offered to get him a candy bar. After his clothes were changed, defendant continued to sit in the room with the security officer with no restraints. There was little conversation during the remaining time in the room, except for brief responses to defendant's questions or comments about how long he had to wait, his request for shoes, medication and food, and his feeling cold.

*Trial Court's Ruling and Admission of Evidence at Trial*

The prosecutor argued the videotaped statements were admissible to show defendant's sanity because they were not the product of an interrogation but

rather arose from a "casual conversation" unrelated to the crime and designed to diffuse any tension, ensure officer safety, and provide for defendant's comfort while waiting for the evidence technician and phlebotomist. In opposition, defense counsel argued the detective knew mental illness was an issue in the crime; the detective's query about the difference between right and wrong sought to obtain information about defendant's sanity; and the other two officers improperly continued to converse with defendant to obtain sanity evidence after he had invoked his *Miranda* rights.

The trial court ruled that, except for the portion of the videotape where defendant invoked his *Miranda* rights, the videotaped statements were admissible. The court evaluated whether the police had formulated "a plan . . . to entice [defendant] to demonstrate that he was sane," and concluded this did not occur. Instead, the court found defendant's statements were made during casual, innocuous discussions designed to keep defendant calm while waiting for the technician and the phlebotomist. Accordingly, the court ruled the prosecution's experts could properly refer to the videotaped conversations when opining on defendant's sanity at the time of the crime.

Based on the court's ruling, the redacted videotaped conversation with the police was played for the jury, and the expert witnesses referred to the videotape when opining on defendant's sanity. Dr. Dietz testified that defendant's ability to identify to the police things that he perceived as wrong (i.e., torture, etc.) showed he was capable "of that level of abstract thought that allows him to say some things are wrong." Dr. Naimark testified the videotape showed defendant was not "grossly psychotic" but rather was "sitting calmly, answering appropriately, and basically had a mostly normal mental state," and the videotape (along with some other materials) caused him to change his original opinion that defendant could not distinguish right from wrong due to his psychosis. The defense expert witness (Dr. Lipson) testified the videotape "softened" his opinion on the sanity issue because he saw signs during the interview that defendant had a "greater appreciation of right and wrong" than was reflected in other materials.

To rebut the prosecution's use of the videotaped conversation to support defendant's rationality, the defense showed the jury the video of defendant in the holding cell at the police station shortly after his arrest and prior to being interviewed by the police. This video depicts defendant pacing and cursing and speaking angrily to himself in an agitated and delusional manner. He eventually calmed down, and was thereafter interviewed by the police.

*Governing Law*

 To protect the constitutional privilege against self-incrimination, the *Miranda* rule requires that before the police may question the defendant during a custodial interrogation, the defendant must be advised of the right to remain silent and to an attorney and that any statements made may be used against him or her in court. (*People v. Gomez* (2011) 192 Cal.App.4th 609, 627 [121 Cal.Rptr.3d 475].) If the defendant invokes the right to silence or to an attorney, the interrogation must cease. (*People v. Davis, supra,* 46 Cal.4th at p. 585.)

Generally, statements elicited in violation of these *Miranda* principles may not be used against the defendant at trial (*People v. Gomez, supra,* 192 Cal.App.4th at p. 627), including to rebut a sanity defense (*People v. Weaver* (2001) 26 Cal.4th 876, 960–961 [111 Cal.Rptr.2d 2, 29 P.3d 103] [expert opinion testimony derived from competency examination that is not afforded *Miranda* protection is inadmissible at sanity phase]; *People v. Ricco* (Ct.App. 1982) 56 N.Y.2d 320 [452 N.Y.S.2d 340, 437 N.E.2d 1097, 1101] [expert's opinion testimony about defendant's sanity derived from defendant's statements to detective inadmissible due to *Miranda* violation]). This exclusionary rule is applied in prophylactic fashion to deter coercive investigative questioning and advance the trustworthiness of trial evidence, even if the defendant's statements were voluntary apart from the *Miranda* violation. (See *Smith v. Illinois* (1984) 469 U.S. 91, 95, fn. 2, 99, fn. 8 [83 L.Ed.2d 488, 105 S.Ct. 490]; *People v. Bradford* (1997) 14 Cal.4th 1005, 1033 [60 Cal.Rptr.2d 225, 929 P.2d 544].)

 The prophylactic *Miranda* protections are triggered only if a defendant is subjected to a custodial interrogation. (*People v. Ochoa* (1998) 19 Cal.4th 353, 401 [79 Cal.Rptr.2d 408, 966 P.2d 442].) Interrogation refers not only to express questioning, but also to its functional equivalent; i.e., " 'any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " (*Pennsylvania v. Muniz* (1990) 496 U.S. 582, 600–601 [110 L.Ed.2d 528, 110 S.Ct. 2638], italics added (*Muniz*).)[10] However, not all police questioning of a person in custody constitutes interrogation. (*People v. Franzen* (2012) 210 Cal.App.4th 1193, 1201 [148 Cal.Rptr.3d 863].) The exclusion for communications "normally attendant to arrest and custody" recognizes that the police may properly perform their normal administrative duties that are *distinct from their investigatory function* without giving rise to *Miranda* protections.

___

[10] An incriminating statement is " 'any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial.' " (*People v. Boyer* (1989) 48 Cal.3d 247, 275, fn. 15 [256 Cal.Rptr. 96, 768 P.2d 610].)

(*Muniz, supra*, 496 U.S. at pp. 600–602; see *People v. Hall* (1988) 199 Cal.App.3d 914, 921 [245 Cal.Rptr. 458]; *Franks v. State* (1997) 268 Ga. 238 [486 S.E.2d 594, 597].)

For example, under the " 'routine booking question' exception" to the *Miranda* rule, the police need not provide *Miranda* warnings prior to asking routine booking questions to secure biographical information. (*Muniz, supra*, 496 U.S. at pp. 601–602; see *People v. Quiroga* (1993) 16 Cal.App.4th 961, 967 [20 Cal.Rptr.2d 446]; *People v. Hall, supra*, 199 Cal.App.3d at p. 921.) Also, the *Miranda* requirements are generally not implicated when the police ask questions related to safety concerns that arise during the arrest or booking process. (*People v. Gomez, supra*, 192 Cal.App.4th at pp. 634–635 [*Miranda* not triggered during routine booking question about gang affiliation designed to ensure safety of jail placement]; *People v. Jones* (1979) 96 Cal.App.3d 820, 827–828 [158 Cal.Rptr. 415] [*Miranda* not triggered by arrest question related to defendant's medical condition].) Similarly, casual conversations or "smalltalk" unrelated to the offense do not typically constitute a *Miranda* interrogation. (*People v. Gamache* (2010) 48 Cal.4th 347, 388 [106 Cal.Rptr.3d 771, 227 P.3d 342]; see *People v. Lewis* (1990) 50 Cal.3d 262, 274–275 [266 Cal.Rptr. 834, 786 P.2d 892]; *People v. Franzen, supra*, 210 Cal.App.4th at pp. 1201–1203; *U.S. v. Foster* (9th Cir. 2000) 227 F.3d 1096, 1102, 1104; *Commonwealth of Pennsylvania v. Abdul-Salaam* (1996) 544 Pa. 514 [678 A.2d 342, 351] ["small talk concerning Appellant's family and injury was merely general conversation, which is routinely attendant with a custodial relationship" and "did not rise to the level of an interrogation"].)

The fact that information gathered from these routine questions or casual conversations turns out to be incriminating does not alone render the statements inadmissible. (See *People v. Gomez, supra*, 192 Cal.App.4th at p. 629.) This principle excluding routine or casual communications from *Miranda*'s coverage can apply even when a defendant has already received *Miranda* warnings and invoked his or her rights. (*U.S. v. Foster, supra*, 227 F.3d at pp. 1103–1104; *Commonwealth of Pennsylvania v. Abdul-Salaam, supra*, 678 A.2d at pp. 350–351.)

However, a *Miranda* interrogation may emerge during routine or casual exchanges if the police ask questions " 'that are designed to elicit incriminatory admissions.' " (*Muniz, supra*, 496 U.S. at p. 602, fn. 14; see *People v. Gomez, supra*, 192 Cal.App.4th at p. 627.) For example, the *Muniz* court held that although a defendant's confused manner of answering routine biographical questions was admissible to prove his intoxication at the time of

his arrest for drunk driving, the defendant's inability to answer a more specific question about his birth date that went beyond a routine booking question was inadmissible. (*Muniz, supra*, 496 U.S. at pp. 585–586, 592–593, 598–602 [due to absence of *Miranda* warnings, defendant's inability to state the date of his sixth birthday was inadmissible to show confused mental state]; see *U.S. v. Hinckley* (D.D.C. 1982) 217 U.S. App.D.C. 262 [672 F.2d 115, 118–126] [due to *Miranda* violation, prosecution could not rebut insanity defense with defendant's responses to federal agents' investigatory questioning about defendant's social, employment, educational, and medical background].)

■ The courts caution that the facts of any routine questioning or casual conversation must be carefully scrutinized to ensure that the police are not using the communication as a pretext for eliciting incriminating information. (See *People v. Gomez, supra*, 192 Cal.App.4th at p. 630.) This cautious approach is particularly appropriate when a defendant has invoked his or her *Miranda* rights before the communication. (*U.S. v. Foster, supra*, 227 F.3d at p. 1103 ["conversations occurring after a person invokes his or her *Miranda* rights must be viewed with suspicion and introduced at trial only with the utmost caution"].) When evaluating whether the *Miranda* requirements should apply during noninvestigative routine or casual exchanges, relevant factors to consider include the nature of the questions, the context of the questioning, the knowledge and intent of the officer asking the questions, the relationship between the questions and the crime, the administrative need for the questions, and any other indications that the questions were designed to elicit incriminating evidence. (*People v. Gomez, supra*, 192 Cal.App.4th at pp. 630–631.)

On appeal from the denial of a *Miranda* exclusionary motion, we defer to the trial court's factual and credibility findings if supported by substantial evidence, and independently determine whether the challenged statements were illegally obtained. (*People v. Ochoa, supra*, 19 Cal.4th at pp. 401–402; *People v. Gomez, supra*, 192 Cal.App.4th at p. 627.)

*Analysis*

The record shows that the police had in their custody a defendant who had viciously stabbed a woman in a parking lot during an apparent panhandling incident, and who had been extremely agitated and exhibited signs of mental illness when he was first placed in a holding cell. After defendant calmed down, a detective read defendant the *Miranda* warnings, defendant agreed to speak, and the detective questioned him about right and wrong. The detective

promptly ceased the interrogation and left the room when defendant invoked his *Miranda* rights.

Thereafter, defendant remained in the room at the police station while awaiting routine processing prior to the transport to the jail. During this waiting period, defendant was placed in the care of a security officer and a police officer. Defendant was restrained at his wrists and waist, but these restraints needed to be removed to accomplish the evidence-gathering process. Given the nature of the crime and defendant's angry, delusional demeanor when he was first placed in a holding cell, the officers would naturally be concerned that he could erupt at any moment in an aggressive fashion, and it is apparent they were taking measures to try to prevent this. This is shown by the detective's request that defendant cooperate with his partner when he left the room; the officers' repeated communications to defendant thanking him for his cooperation with the necessary booking procedures; and their soft-spoken, solicitous attitude towards him during all their interactions. Consistent with this approach, the officers attempted to engage defendant in conversation during the early stages of the waiting period prior to the arrival of the evidence technician and phlebotomist. The conversations elicited by the guarding officers never mentioned the offense or distinctions between right and wrong, but concerned neutral topics about defendant's interests and life.

Based on our independent review of the video, we are satisfied the conversations generated by the guarding officers fall within permissible casual conversation normally attendant to a custody situation, and they did not constitute interrogation designed to elicit incriminating responses that trigger application of the prophylactic *Miranda* rule. The use of conversation to calm a potentially explosive situation with a suspect is well within the parameters of an officer's routine performance of safety-related duties and is distinct from an officer's investigative duties. The fact that the casual conversations later constituted evidence of rationality relevant to defendant's sanity at the time of the offense does not translate into a *Miranda* violation. Because there was no interrogation after defendant's invocation of his *Miranda* rights, the trial court did not err in denying the suppression motion.

III. *Parole Revocation Restitution Fine**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

"See footnote, *ante*, page 70.

## DISPOSITION

The $10,000 parole revocation restitution fine under section 1202.45 is stricken from the judgment. As so modified, the judgment is affirmed. The superior court shall prepare an amended abstract of judgment removing the $10,000 section 1202.45 parole revocation restitution fine, and forward the amended abstract to the Department of Corrections and Rehabilitation.[13]

Huffman, Acting P. J., and Nares, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 12, 2013, S210066.

---

[13] The section 1202.4, subdivision (b)(1) restitution fine should remain in the abstract of judgment.