Filed 1/15/14  P. v. Tlamasico CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JIMMY TLAMASICO,<br><br>    Defendant and Appellant. | G047484<br><br>(Super. Ct. No. 10CF1258)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Richard F. Toohey, Judge.  Affirmed as modified.

Arthur Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William Wood, Karl T. Terp, and Joy Utomi, Deputy Attorneys General, for Plaintiff and Respondent.

An information charged Jimmy Tlamasico and Ranferi Ivan Cruz with first degree murder (Pen. Code, §§ 187, subd. (a), 189),[1] second degree robbery (§§ 211, 212.5, subd. (c)), and active participation in a criminal street gang (§ 186.22, subd. (a)). The information also alleged two special circumstances, murder committed during the perpetration of a felony (§ 190.2, subd. (a)(17)) and murder committed for a criminal street gang purpose (§ 190.2, subd. (a)(22)), two firearm enhancements (§ 12022.53, subds. (d), (e)(1)), and two gang enhancements (§ 186.22, subd. (b)(1)).

The People severed the codefendants' cases for trial. After the People rested, the court dismissed the criminal street gang murder special circumstance. A jury found Tlamasico guilty of all counts and found true all enhancements and the felony-murder special circumstance. The trial court sentenced Tlamasico to life without the possibility of parole for the murder, plus 25 years to life for the gang enhancement associated with the murder.

Tlamasico claims the trial court erred by giving CALCRIM No. 1403 because the instruction improperly permitted the jury to consider gang evidence when evaluating his intent to commit the charged crimes and his defenses. He also asserts California's special circumstance statute violates principles of due process because it provides no meaningful difference between felony murder and the felony-murder special circumstance and invites prosecutorial abuse. Finally, he contends the trial court improperly imposed and suspended a parole revocation fine. The Attorney General concedes the last issue, and we correct the abstract of judgment to strike the parole revocation fine. Tlamasico's remaining claims are meritless. Therefore, the judgment is affirmed as modified.

---

[1] All further statutory references are to the Penal Code.

## FACTS

Around 2:00 a.m. on May 23, 2010, Santa Ana police officers were dispatched to the scene of the shooting. They arrived to find two cars with collision damage. One person, Jose Nieto-Bautista, was lying unconscious in a nearby grassy area with a fatal bullet wound to the neck. The officers found a bat inside Nieto-Bautista's truck.

Humberto Rodriguez, one of Nieto-Bautista's friends, was at the scene and talked to police officers. He told the officers that he and Nieto-Bautista had spent the evening at a dance club. They were driving through a residential area when Nieto-Bautista decided to stop. Rodriguez got out of the truck and someone immediately grabbed him around the neck, demanded his money, and whistled. This person pushed Rodriguez to the ground and removed his money and cell phone.

Two other people quickly appeared and surrounded Nieto-Bautista. One of them produced a silver, semiautomatic handgun from the waist band of his pants and fired two shots at Nieto-Bautista while the man who took Rodriguez's money and cell phone ran away. Rodriguez and Nieto-Bautista got back into the truck. When they pulled away from the curb, the gunman fired a third shot at the truck just before Nieto-Bautista crashed into another car. Rodriguez described all three individuals as "cholos" or "chilinos," which is slang for gangster. Rodriguez denied seeing Nieto-Bautista grab a bat from his truck, although he also claimed to not remember most of what happened that night.

Noel Aguirre-Ozaeta, who lived near the scene of the shooting and knew the Santa Nita street gang claimed this area as its territory, witnessed the crime. He testified that on the night of May 22, he had been accosted by Cruz as he left a nearby convenience store. Cruz, an admitted member of Santa Nita, grabbed Aguirre-Ozaeta around the neck and pulled him toward a nearby park. Aguirre-Ozaeta thought Cruz

3

wanted to pull him into the park where other Santa Nita gang members were waiting. He struggled with Cruz, but managed to free himself and run home.

A few hours later, Cruz and two other people appeared at Aguirre-Ozaeta's house and yelled for him to come outside. Aguirre-Ozaeta did not comply. When the three men turned to leave, Aguirre-Ozaeta decided to flee his home. He did not get far before he saw a group of people, which prompted him to hide in some nearby bushes.

Aguirre-Ozaeta then saw a white truck stop approximately 60 meters away from him.[2] At trial, when the prosecutor asked him to describe what happened next, Aguirre-Ozaeta testified, "There was a gentleman in a white truck to pick up a woman from the streets. And when he was pulling out his wallet, some people got there. He didn't want – he didn't want to give them the wallet."

Aguirre-Ozaeta testified there were three assailants, including Cruz, but that Cruz stood behind another person with a gun. He heard all three individuals, including the gunman, repeatedly demand that the man from the white truck turn over his wallet. The man refused to turn over his wallet, retrieved a bat from his truck, and took a swing at the gunman. The gunman fired two shots in response. Aguirre-Ozaeta testified the driver of the truck was wounded when he got back into his truck, and Aguirre-Ozaeta saw the truck crash at a nearby intersection. Aguirre-Ozaeta testified he saw two people in the truck, but that the passenger ran from the truck before the shooting.

On May 24, police officers executed a search warrant at Tlamasico's house, which was about 150 feet from the scene of the homicide. They found the gun used to kill Nieto-Bautista in Tlamasico's backpack.

Tlamasico was taken into custody and questioned about his involvement in the robbery and murder. Initially, he denied any involvement in either crime. However,

---

[2] Aguirre-Ozaeta testified the truck was 60 meters away. When asked to estimate the distance in court, he pointed to a wall in the courtroom, which the trial judge stated was 58 feet away.

4

under further questioning, he admitted shooting Nieto-Bautista. He then told officers he shot Nieto-Bautista because "the guy came at him wrong" and had a bat. He agreed with the officers' characterization of the incident as a "disrespect thing," but claimed no one demanded money. Tlamasico explained that he had simply heard a disturbance and walked over to investigate only to have someone come at him with a bat. He also said he saw Nieto-Bautista at a store before the shooting, and that Nieto-Bautista had been drunk.

The parties stipulated Santa Nita is a criminal street gang as the term is used in section 186.22. At trial, the People called Santa Ana Police Detective Julian Rodriguez as its gang expert. Detective Rodriguez, a 16-year law enforcement veteran, detailed his extensive training and experience with Hispanic criminal street gangs in general and Santa Nita in particular.

According to Detective Rodriguez, Santa Nita claims the area where the crime occurred as its gang territory, and the primary activities of Santa Nita include robbery and firearms offenses. He also explained the importance of respect in gang culture. On this point Detective Rodriguez testified, "in the Hispanic criminal street gang subculture, respect and disrespect are not viewed the same way as we may be having a discussion as let's say professionals or good parents or good employees, it's more akin to fear. And how much fear [a gang] can exert in their community to non gang members and rival gang members alike. [¶] That fear, that intimidation that they can cause or create extends fear of influence wherever it is that their area is, which gives them an opportunity to commit crimes in that area. It causes people to be intimidated so they don't report things to the police. It causes fear of retaliation." Detective Rodriguez stated more violent crimes garner more respect for the gang and the individual gang member.

Detective Rodriguez also explained the importance of backup, which he described as the obligation of gang members to assist each other in the commission of crimes. In his opinion, if one gang member is committing a robbery any other gang

5

member nearby is expected to aid the robber. He testified to the importance of guns in criminal street gang culture, and said they are used for "defensive and offensive purposes."

In preparation for his testimony, Detective Rodriguez reviewed at least 16 documented police contacts with Tlamasico between 2006 and 2009, which included 10 STEP notices and five field interview cards, and that Tlamasico had been referred to in at least six police reports. Based on his extensive training and experience with Santa Nita and his review of various police records, Detective Rodriguez opined Tlamasico was an active participant in the Santa Nita gang. When given a hypothetical question based on the facts of the case, Detective Rodriguez testified Tlamasico committed the instant offenses with the specific intent to benefit Santa Nita. He believed this to be true, in part, because Tlamasico had committed the crimes with the assistance of other Santa Nita gang members in Santa Nita's claimed territory. In his opinion, Santa Nita benefitted from the crime by collecting and sharing the revenue of their crimes and by garnering respect for the gang.

## INTRODUCTION

The prosecution pursued a murder conviction under two theories: (1) first degree felony murder (robbery); and, (2) second degree murder under an express malice theory. The court instructed the jury on first degree felony murder (CALCRIM No. 540A), robbery (CALCRIM No. 1600), aiding and abetting robbery (CALCRIM No. 1603), and second degree murder with malice aforethought (CALCRIM No. 520).

Defense counsel asserted Tlamasico merely "heard [a] commotion, knew some of these people, went over to see what happen[ed], what's going on, and somebody comes at him swinging a bat . . . ." Emphasizing inconsistencies between the witnesses' testimony, counsel stated Tlamasico did not intend to aid and abet a robbery, and even if he did, Tlamasico did not form the intent to aid and abet the robbery until after the man who took Aguirre-Ozaeta's money and cell phone had reached a place of safety.

6

In light of Tlamasico's defense, the court instructed the jury on justifiable homicide (self-defense or defense of others (CALCRIM No. 505)), voluntary manslaughter based on provocation (CALCRIM No. 522), voluntary manslaughter upon sudden quarrel or heat of passion (CALCRIM No. 570), and voluntary manslaughter under an imperfect self-defense (CALCRIM No. 571).

The court also gave general instructions on the duties of the jury (CALCRIM No. 200), the reasonable doubt standard (CALCRIM No. 220), the definition of motive (CALCRIM No. 370), the definition of evidence, which excludes the statements of trial counsel (CALCRIM No. 222), the difference between direct and circumstantial evidence (CALCRIM No. 223), how to judge the credibility of witnesses (CALCRIM No. 226), how to resolve conflicts in the evidence (CALCRIM No. 302), expert testimony (CALCRIM No. 332), and limitations on the use of evidence of gang activity (CALCRIM No. 1403).

## DISCUSSION

Tlamasico claims CALCRIM No. 1403 improperly allowed jurors to use gang evidence for impermissible purposes. He also challenges the constitutionality of California's special circumstance statutes, and the imposition of a parole revocation fine. We address each issue in turn.

*CALCRIM No. 1403*

Although no objection was lodged at trial,[3] Tlamasico argues CALCRIM No. 1403 improperly permitted the jury to consider the gang evidence when determining whether he voluntarily participated in the robbery, or unknowingly thrust himself into a conflict and killed in self-defense or heat of passion. He claims the instruction violates Evidence Code section 1101, subdivision (a)'s prohibition against the use of character

---

[3] Despite the lack of a contemporaneous objection, a defendant's claim that an instruction misstated the law or violated due process is cognizable on appeal. (§ 1259; *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7.)

7

evidence. He also complains the instruction runs afoul of "fundamental principles of justice" contained in state and federal Constitutions and unconstitutionally lowered the prosecution's burden of proof. We are not persuaded.

When reviewing challenged jury instructions, we begin with the principle that "the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." (*People v. Burgener* (1986) 41 Cal.3d 505, 538-539, disapproved on other grounds in *People v. Reyes* (1998) 19 Cal.4th 743, 753-754.) "We assume that the jurors are ""'intelligent persons and capable of understanding *and correlating* all jury instructions . . . given.'"" [Citation.]" (*People v. Franco* (2009) 180 Cal.App.4th 713, 720.) When a criminal defendant alleges instructional error, our standard of review is de novo. (See *People v. Burgener* (1986) 41 Cal.3d 505, 538-540, disapproved on other grounds in *People v. Reyes*, *supra*, 19 Cal.4th at p. 754; *People v. Dieguez* (2001) 89 Cal.App.4th 266, 274-280.)

The trial court gave the following version of CALCRIM No. 1403: "'You may consider evidence of gang activity only for the limited purpose of deciding whether the defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and enhancements charged, or the defendant had a motive to commit the crimes charged, or the defendant actually believed in the need to defend himself, or the defendant acted in the heat of passion. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is [a] person of bad character or that he has a disposition to commit crime.'"

This instruction, which gives the jury the option to consider evidence of gang activity in deciding whether the defendant acted with the intent, purpose, and

8

knowledge that are required to prove the gang-related crimes, enhancements, and special circumstance allegations charged, has been held to be "neither contrary to law nor misleading." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1168 (*Samaniego*).)

Tlamasico protests that in his case CALCRIM No. 1403 allowed the prosecution to improperly prove "a specific defendant had a specific mental state." He claims the jury had to determine his intent to commit robbery and whether he acted in self-defense or heat of passion without using gang evidence. He cites no authority for either proposition, and it is Tlamasico's burden to provide legal authority in support of his contentions. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852, fn. omitted ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived. [Citation.]"].)

Instead of legal authority supporting his specific contention, Tlamasico relies on the general rule that evidence of a defendant's criminal disposition is inadmissible to prove he or she committed a specific crime. (Evid. Code, § 1101, subd. (a).) Tlamasico has correctly stated the general rule regarding character evidence, but he has not shown CALCRIM No. 1403 permitted the jury to use gang evidence in a way the instruction pointedly says it should not be used.

What Tlamasico fails to appreciate that "[a] crime is gang related if it is related to a criminal street gang as defined in section 186.22, subdivisions (e) and (f). The elements of this definition require: (1) an ongoing organization or group, (2) of three or more persons, (3) having as one of its primary activities the commission of the crimes enumerated in section 186.22, subdivision (e)(1)-(25), (4) having a common name or symbol, and (5) whose members individually or collectively have engaged in a pattern of criminal gang activity . . . ." (*In re Jorge G.* (2004) 117 Cal.App.4th 931, 944.) Once the jury determines a crime is gang-related, "[e]vidence of the defendant's gang affiliation — including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like — can help prove identity, motive,

9

modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049-1050 (*Hernandez*).)

Here, the information charged a gang-related robbery, which led to a murder. In such a case, evidence of gang membership and activity was clearly relevant to prove Tlamasico had the specific intent to benefit Santa Nita by participating in the robbery. (See *People v. Funes* (1994) 23 Cal.App.4th 1506, 1516, 1518-1519.) There is simply no basis in either law or logic to parse Tlamasico's intent in the way he suggests. In fact, under the circumstances of this case, CALCRIM No. 1403 had to be given at the prosecutor's request. (See, e.g., *Hernandez*, *supra*, 33 Cal.4th at pp. 1051-1052 [The law is clear that a court may not give No. 1403 sua sponte but, if requested — as it was here, by the prosecution — it must be given]; *People v. Jones* (2003) 30 Cal.4th 1084, 1116.)

Here, Detective Rodriguez testified about Santa Nita's primary activities, the fact the shooting occurred in Santa Nita's claimed territory by Santa Nita gang members, and his opinion as to the purpose and importance of respect and backup in criminal street gang culture. Each of these items was relevant to Tlamasico's motive, intent, and "other issues pertinent to guilt of the charged crime . . . ." (*Hernandez, supra,* 33 Cal.4th at pp. 1049-1050; see also *Samaniego, supra,* 172 Cal.App.4th at pp. 1167-1168.)

Moreover, CALCRIM No. 1403 states in no uncertain terms gang evidence is inadmissible to prove character, or that the defendant is a bad person or has a criminal propensity. It allows such evidence to be considered only on the issues germane to the gang-related crimes and enhancements. (*Samaniego, supra,* 172 Cal.App.4th at p. 1168; *cf.* also *People v. Garcia* (2008) 168 Cal.App.4th 261, 275; *People v. Martinez* (2003) 113 Cal.App.4th 400, 413.) Thus, contrary to Tlamasico's claim, evidence of Santa Nita's claimed territory, the gang's primary activities, notions of gang loyalty, respect,

10

and backup were all relevant to determine his intent with respect to the charged crimes and his claims of self-defense and heat of passion.

Here, the trial court gave instructions on aiding and abetting, which specifically required the jury to determine Tlamasico's knowledge of the intended crime and when he obtained that knowledge and formed the intent to assist the perpetrator. The court also instructed the jury on self-defense, voluntary manslaughter under the applicable theories, and the burden of proof. Thus, we conclude it is not reasonably likely the jury interpreted CALCRIM No. 1403 in the way Tlamasico suggests.

In sum, Tlamasico's arguments overlook the essential purpose of CALCRIM No. 1403, which is to clarify the limited purpose of gang evidence. CALCRIM No. 1403 is used to minimize undue prejudice to a defendant whose case involves otherwise highly prejudicial gang evidence. The instruction clearly states gang evidence is admitted for limited purposes only. It also delineates those purposes. And, the final paragraph emphasizes: "You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime." Tlamasico has failed to provide any evidence from the record that supports his speculation the jury found the instruction confusing, or improperly relied on gang evidence as proof he is a person of bad character with criminal propensities.

To the extent Tlamasico complains references to witnesses "credibility" in CALCRIM No. 1403 constituted an improper challenge to his own credibility, we find this assumption unsupportable. While Tlamasico contends Aguirre-Ozaeta "was not especially credible," we recognize that it is the jury's responsibility to assess witness credibility. (CALCRIM No. 226.) Furthermore, the instruction clearly applies to witness testimony. Tlamasico was not a witness because he did not testify at trial, and the jury was correctly instructed on the permissible use of his pretrial statement (CALCRIM No. 358).

11

With respect to Tlamasico's due process claim, in order for him to prevail we must assume the jury made improper use of gang evidence notwithstanding CALCRIM No. 1403's specific direction to use gang evidence only for limited and specifically delineated purposes. However, as a reviewing court, we presume the jury consists of "intelligent persons who are fully able to understand, correlate and follow the instructions given to them." (*People v. Archer* (1989) 215 Cal.App.3d 197, 204.) Absent some affirmative indication in the record to the contrary, and here there is none, we presume the jury followed the limiting instruction as written. (*People v. Waidla* (2000) 22 Cal.4th 690, 725; *People v. Holt* (1997) 15 Cal.4th 619, 662.)

And, finally, overwhelming evidence supports the verdict. Tlamasico shot Nieto-Bautista during a gang-related robbery. Two witnesses said he participated in the robbery from its inception. His defense that he merely heard a commotion, went to investigate, and was attacked by a bat-wielding maniac was weak at best, with or without evidence he acted in his own gang's claimed territory with other members of his gang, a gang whose primary activities include robbery and weapons offenses. Under the facts adduced at trial, we conclude any error in giving CALCRIM No. 1403 was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

*Constitutionality of the Felony-Murder Special Circumstance*

Tlamasico claims California's special circumstance statute violated his right to due process of law under the federal Constitution. He asserts there is no "meaningful distinction between first degree felony[-]murder" and the felony-murder "special circumstance," the felony-murder special circumstance statute lacks "'sufficient definiteness,'" and it "gives the prosecutor unfettered discretion encouraging arbitrary and discriminatory enforcement." In addition, he distinguishes the potential punishments for special circumstance murder to those available for first degree murder and argues he had no notice of the harsher penalties available under the special circumstance statute. Again, we find his arguments unpersuasive.

12

A penal statute is unconstitutionally vague if it fails to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." (*Kolender v. Lawson* (1983) 461 U.S. 352, 357.) Challenges to statues on grounds of vagueness that do not threaten First Amendment interests are examined in light of the facts of the case at hand, and "the statute is judged on an as-applied basis." (*Maynard v. Cartwright* (1988) 486 U.S. 356, 361.)

Section 189 provides, in relevant part, "All murder which is perpetrated . . . by any other kind of willful, deliberate, and premeditated killing . . . is murder of the first degree." The penalty for first degree murder is death, life imprisonment without the possibility of parole, or imprisonment for a term of 25 years to life. (§ 190, subd. (a).) The penalty for murder committing with specified special circumstances is death or life imprisonment without the possibility of parole. (§ 190.2, subd. (a).) Section 190.2, subdivision (a)(17), states the felony-murder special circumstance applies to murders "committed while the defendant was engaged in, or was an accomplice in, the commission of attempted commission of, or the immediate flight after committing, or attempting to commit" certain felonies, including robbery.

In *People v. Andreasen* (2013) 214 Cal.App.4th 70 (*Andreasen*), the defendant made an unsuccessful attempt to panhandle one patron in a shopping center parking lot before he committed an assault on another shopper nearby. (*Id.* at p. 74.) The defendant repeatedly stabbed this woman and caused her death. (*Id.* at p. 75.) At trial, the prosecutor introduced evidence of prior offenses involving panhandling and assault, and several other incidents of "aggressive panhandling." (*Id.* at p. 76.) The prosecution pursued theories of first degree premeditated murder, felony-murder based on attempted robbery, and the felony-murder special circumstance. (*Ibid.*) The jury convicted him of first degree murder and found true a special circumstance allegation that the murder was during the commission of an attempted robbery. (*Id.* at p. 73.)

13

On appeal, the defendant, like Tlamasico, asserted a due process challenge to the felony-murder special circumstance statute. (*Andreasen, supra,* 214 Cal.App.4th at p. 79.) As here, the defendant in *Andreasen* claimed that as applied to the actual perpetrator of the killing, the felony-murder offense (§ 189) is indistinguishable from the felony-murder special circumstance (§ 190.2, subd. (a)(17). Thus, the defendant asserted, he had no way of anticipating whether he would be subjected to the possibility of death or life in prison without parole as opposed to life with the possibility of parole, and the prosecutor had unfettered discretion to select the charge. (*Ibid.*) After reviewing the pertinent statues, the court stated, "[t]hese statutes provided defendant with notice that if he commits a statutorily specified felony and kills someone during that felony, he could be subjected to a sentence of 25 years to life with the possibility of parole, life without parole, or death. Defendant had notice as to the proscribed conduct and potential punishment." (*Id.* at p. 80.)

Furthermore, the appellate court rejected the defendant's assertion that section 189 and section 190.2, subdivision (a)(17) are indistinguishable: "[T]he felony-murder offense is established merely upon a showing that the defendant killed during the commission or attempted commission of the felony, whereas the felony-murder special circumstance requires an additional showing that the intent to commit the felony was independent of the killing." (*Andreasen, supra,* 214 Cal.App.4th at p. 80.) We find *Andreasen* on point and its analysis compelling.

In addition, the simple fact harsher punishment results from a special circumstance finding makes no difference. "The courts have repeatedly rejected constitutional challenges to the imposition of the special circumstance punishment on the direct killer, even though the statue can operate to punish a felony murderer who kills unintentionally more harshly than a simple murderer who kills intentionally. [Citations.]" (*Andreasen, supra,* 214 Cal.App.4th at p. 81.)

14

We also reject Tlamasico's complaint the statutes give too much discretion to prosecutors. In *United States v. Batchelder* (1979) 442 U.S. 114, 125, the United States Supreme Court observed, "[T]here is no appreciable difference between the discretion a prosecutor exercises when deciding whether to charge under one of two statutes with different elements and the discretion he exercises when choosing one of two statutes with identical elements. In the former situation, once he determines that the proof will support conviction under either statute, his decision is indistinguishable from the one he faces in the latter context. The prosecutor may be influenced by the penalties available upon conviction, but this fact, standing alone, does not give rise to a violation of the Equal Protection or Due Process Clause. [Citations.]" (See also *People v. Carter* (2005) 36 Cal.4th 1215, 1280.)

Tlamasico also complains his first degree murder conviction makes him "death eligible" in a case in which he killed in self-defense or with heat of passion. Not so. The jury heard the prosecution's theories and Tlamasico's defenses, and it rejected Tlamasico's defenses. Substantial evidence supports the jury's determination. The existence of substantial evidence from which a rational trier of fact could find beyond a reasonable doubt the essential elements of first degree murder, as well as the felony-murder special circumstance, satisfies the due process clause of the United States Constitution, as well as its counterpart in article I, section 15 of the California Constitution. (*People v. Jennings* (2010) 50 Cal.4th 616, 648-649; *People v. Berryman* (1993) 6 Cal.4th 1048, 1083.)

Tlamasico points to footnote No. 7 in *Andreasen, supra,* 214 Cal.App.4th at p. 82, and contends "the opinion acknowledges its ruling contradicts controlling authority, but purports to reject that authority based on another case having nothing to say about the issue at hand." However, this argument is not well-taken. In footnote No. 7, the *Andreasen* court merely acknowledged the "independent-felonious-purpose" requirement existed with respect to felonies that involve only the intent to assault under

15

the merger doctrine, but that this holding had been prospectively overruled by *People v. Farley* (2009) 46 Cal.4th 1053, 1113-1114.  The *Andreasen* court's holding, i.e., that the independent-felonious-purpose requirement is confined to the special circumstance and it does not extend to the felony-murder offense (*Andreasen, supra,* 214 Cal.App.4th at p. 82, fn. 7), does not, as Tlamasico claims, contradict existing controlling authority for cases involving a robbery and homicide where the merger doctrine is inapplicable.

In short, none of Tlamasico's challenges to the felony-murder special circumstance have merit, and we find no basis for reversal with respect to any of Tlamasico's contentions.

*Parole Revocation Fine*

Tlamasico and the Attorney General agree the trial court improperly imposed a parole revocation fine of $5,000 (§ 1202.45) because Tlamasico's sentence does not include a determinate term.  (*People v. Carr* (2010) 190 Cal.App.4th 475, 482.) We agree and modify the judgment accordingly.

**DISPOSITION**

The judgment is modified to strike the parole revocation fine imposed pursuant to section 1202.45.  The clerk of the superior court is directed to correct the abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation.  As modified, the judgment is affirmed.


THOMPSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


BEDSWORTH, J.

16