Filed 1/31/23 P. v. Gomes CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DERRICK CHARLES GOMES,<br><br>    Defendant and Appellant. | F083641<br><br>(Kings Super. Ct. No. 19CMS4794)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County. Valerie R. Chrissakis, Judge.

Aaron J. Schechter, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Paul E. O'Connor, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### INTRODUCTION

Appellant and defendant Derrick Charles Gomes was charged and convicted of assault with a deadly weapon, a knife (Pen. Code, § 245, subd. (a)(1))[1] and willful

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

infliction of a corporal injury resulting in a traumatic condition upon a cohabitant or someone with whom he was in a dating relationship (§ 273.5, subd. (a)). He was sentenced to an aggregate term of eight years in prison. On appeal, he contends the court should have granted his motion to exclude his pretrial statements because they were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), and any implied waiver was involuntary and coerced. He also raises several issues arising from the sentencing hearing, including that the court improperly imposed a protective order prohibiting certain contact with the victim.

We find defendant's statement was properly admitted, and the court properly imposed the protective order. We agree with the parties that remand is required for the court to address defendant's other sentencing issues and vacate the sentence accordingly.

## FACTS

On September 19, 2019, M.H. was living with defendant, who was her boyfriend, in a garage that had been converted into a living space (the garage) with a bed and other furnishings. The garage was adjacent to the home of M.H.'s mother on East Sixth Street in Hanford.

Around 5:00 p.m., M.H.'s mother was in her house and heard yelling coming from the garage. She did not immediately go inside the garage, but when she did, her grandchildren were there, and things were confusing. She saw a lot of blood but did not know where it was coming from.

M.H.'s mother testified that M.H. was "laying on the floor," and defendant was holding and "hanging onto her." Defendant was yelling and "kind of up upset," and said that "he had thrown a phone and it hit her." Defendant also said that he threw the phone against the wall. M.H.'s mother testified that defendant seemed to be talking to M.H. "[l]ike she had done something." She did not see defendant holding or talking on a phone; she called 911.

**The Initial Investigation**

Kings County Sheriff's Deputy Verhoeven received a dispatch that there was a medical emergency at the residence, and a female subject was bleeding for an unknown reason. He arrived at the residence within minutes of the dispatch. As Verhoeven drove up, defendant was outside, talking on a cell phone, and walking toward his patrol vehicle.

Deputy Verhoeven testified defendant was covered in blood and looked panicked. Verhoeven asked defendant if he was bleeding, and defendant said no. Verhoeven asked where the female was and what was going on. Defendant said that "he was in an argument and he threw a cell phone and it ricocheted off of a wall and hit the female" in the head, and she started bleeding. Verhoeven wanted to confirm he heard defendant correctly and asked if he had thrown a phone. Defendant "said no, a folding knife." Verhoeven asked where the knife was, and defendant said it was at the foot of the bed. After hearing this information, Verhoeven detained defendant and placed him in a patrol vehicle.

Deputy Coghlan also responded to the dispatch and entered the garage. M.H. was lying on her stomach on the floor and appeared unconscious. She was bleeding from a wound on her left ear, and there was a lot of blood around her. Coghlan applied pressure to the ear wound. M.H. made some sounds and Coghlan encouraged her to stay awake.

Deputy Coghlan found a knife at the foot of the bed, near M.H.'s location. The knife was opened halfway into an "L" shape. Coghlan seized the knife and tried to close it, but the mechanism was jammed. It was later determined the fully opened knife measured six inches long. While it would fully open, Coghlan had to adjust the mechanism to completely close it.

Deputy Weimer arrived at the scene, examined the knife, and found droplets of blood on it. There was blood on floor and the mattress. The walls of the converted garage were dirty, and Weimer did not see any fresh marks on any wall consistent with being caused by a knife.

**M.H.'s Injuries**

Emergency personnel responded to the garage and transported M.H. to Kaweah Delta Hospital. Dr. Ameneh Kalani, the trauma surgeon on call, treated M.H. in the emergency room. M.H. was conscious, but she was confused and was unable to respond to questions about where she was injured. Her hair and face were covered with blood. It was difficult to pinpoint and assess exactly where she was bleeding from. There was blood slowly "oozing" from her left ear and the back of her head. There was some dried blood on the left side of her face and fresh blood in her ear. M.H. was "hypotensive," which meant her blood pressure was very low.

Dr. Kalani found bruising and multiple lacerations on the back of her skull. These lacerations were very small – about one to two centimeters.

Dr. Kalani ordered M.H. taken for CT scans of her head and neck. She was concerned M.H. had a major internal injury and bleeding "from somewhere that you are not detecting," because a hypotensive patient may act confused when not getting sufficient blood to the brain.

Dr. Kalani accompanied M.H. to the CT scan and reviewed the results. She did not see any evidence of a head injury or a stroke. She decided to take M.H. back to the emergency room for further evaluation because she was not "majorly" bleeding at that point. They cleaned her face and hair to locate and suture any external wounds.

While M.H. was in the emergency room, Dr. Kalani decided to intubate and sedate her for her own safety because she was confused and combative, her "neuro" status was not clear, and it also was not clear if she suffered a head injury. Once she was intubated, it was not possible to determine whether M.H. had suffered any brain injuries or deficits, but there was no evidence of a stroke on the CT scans.

Dr. Kalani testified that as they were cleaning her left ear, M.H. started "pouring out blood from that area by her ear and neck." Dr. Kalani applied pressure to the area

4.

and rushed M.H. to the operating room for emergency surgery. Dr. Kalani called in a vascular surgeon to assist because she believed M.H. suffered a major vascular injury.

Dr. Kalani testified they conducted "a left neck exploration" during the surgery to examine "this area of [M.H.'s] neck [where] you have a lot of major vessels that extend[] to the brain and you could actually bleed out from this area." Dr. Kalani determined M.H. had "more injuries than I had expected when she first came in" to the emergency room, and the laceration was deeper than initially determined.

M.H. had a laceration in her left earlobe that "had gone through inside the ear, through the earlobe, through the back of the ear, divided this whole area," and the ear had been cut into two pieces that were "holding on with a few area[s] of cartilage[]."

The earlobe laceration extended to the left side of M.H.'s neck and "had gone … deep in the neck," about four to five centimeters, and "[t]hat's why we hadn't seen it earlier." The deep neck laceration damaged her jugular vein, the external carotid artery branch, and "a lot of little branches" that supply blood to and from the brain.

Dr. Kalani testified M.H. suffered a "penetrating injury" inflicted by a sharp object, possibly a knife, that went "through the left ear … deep into the neck to cause those vascular injuries, because those vessels are deep in your neck." The penetrating injuries were deeper than if someone had just thrown a rock at her neck.

Dr. Kalani and the vascular surgeon repaired these injuries. M.H. was stable after the surgery and taken to the intensive care unit. She was still intubated and sedated. Dr. Kalani saw her again about four or five hours later, and she was in the same condition. Dr. Kalani went off duty later the next morning.

Dr. Kalani testified that about 10 days later, M.H. was assigned to her rotation as a patient. Dr. Kalani learned that at some point after surgery, M.H. suffered a massive left side ischemic stroke as shown on updated CT scans. The blood flow to the left side of her brain had been cut off as result of the penetrating injuries to her jugular vein and carotid artery. The stroke left her paralyzed, on breathing and feeding tubes, and unable

5.

to move her right side, which is consistent with a stroke on the left side of the brain. She had facial drooping on the right side, and she was unable to speak or communicate. Dr. Kalani did not know the actual date when M.H. suffered the stroke.

M.H. did not testify, but her sister appeared at trial and testified that M.H. did not have any physical or speaking limitations prior to this incident. Afterwards, M.H. was in different hospitals for three months, she was unable to walk or speak, she could not move the right side of her face, and she could not take care of herself after being discharged.[2]

**Defendant's Pretrial Statement**

Deputy Weimer testified that he interviewed defendant on the night of the incident and advised him of the advisements pursuant to *Miranda*. Defendant said he understood his rights and gave a statement about what happened. Defendant was crying and emotional at times.[3]

Deputy Weimer testified defendant said he was M.H.'s boyfriend, and they lived in the garage. Defendant said they argued about a phone call, and M.H. wanted to leave. Defendant said that he decided to leave and take the bedsheets with him. M.H. did not want him to take the sheets because her mother had purchased them.

Defendant said he "grabbed a folding knife from a cup on the nightstand that was kind of at the end of the bed," and he "was essentially going to cut the sheets" with the knife. M.H. said to give her the knife because it belonged to her. Defendant said he was standing about five feet away from M.H., who was sitting on the edge and corner of the

---

[2] During pretrial motions, the prosecutor stated that M.H. was not competent to testify because she had suffered the stroke and a traumatic brain injury, and she had four or five surgeries.

[3] In part I, *post*, we will address defendant's contentions that the court should have excluded his pretrial statements as obtained in violation of *Miranda*, coercive, and involuntary. As will be explained, Weimer testified at trial as to defendant's pretrial statements, and the video and transcript of the interview were not introduced before the jury.

bed. Defendant said he cursed her and "threw the knife to her." Defendant said he threw it "toward the wall."

Defendant said that he "folded" the knife before he threw it, but he was not sure if it was "shut." Defendant said that as he threw the knife, "he kind of turned away and he heard what he thought would be the knife hitting the wall."

Deputy Weimer testified that he asked defendant if he threw the knife past M.H. Defendant said yes. Weimer asked if he threw it behind her, and defendant said yes.

Defendant said that after he threw the knife, M.H. screamed and made a loud noise. He turned around and saw M.H. was bleeding from the left side of her head. Defendant assumed the knife ricocheted off the wall and hit her shoulder, but she was holding her head. Defendant said that he intended to take her to the hospital and not wait for the paramedics, but she collapsed into his arms.

## DEFENDANT'S TESTIMONY

Defendant testified at trial and said that M.H. had been his girlfriend since 2015. Defendant initially claimed he lived at his own mother's house and only occasionally stayed with M.H. in the converted garage. On cross-examination, defendant admitted he lived with M.H. in the converted garage for the "majority of the time," and only had stayed with his mother for the week before the incident.

On the day of the incident, defendant went to the converted garage after work, M.H. was there, and they argued because another woman contacted him. M.H. told him to get his things and leave. Defendant testified he acted childish and said he wanted the bed sheets because they were from his mother, and M.H. refused.

Defendant picked up M.H.'s knife from the nightstand near the bed. Defendant told M.H. that he would cut the sheets if he could not take them. M.H. told defendant to give her the knife and leave, and she would give him his stuff later.

Defendant told M.H. that was fine. He thought he closed the knife, but it got jammed. Defendant testified that he was mad, and he threw the knife at the wall with

some force. "[I]t was a moment of aggravation because I was being told to leave and get my stuff and, you know, give me the knife, put it away, and I just threw it at the wall just to get away from the situation and I walked out."

Defendant testified that when he threw the knife, he was standing about two feet from the foot of the bed. He was facing M.H., and she was about five feet away from him. M.H. was sitting on top of the bed, about midway on the mattress and on top of the sheets so he could not take them.

Defendant testified that he threw the knife at the wall, turned around, grabbed his clothes, and started to walk out. Defendant heard M.H. make noise; he turned toward her and realized she was bleeding. He "grabbed her off the bed and tried to take her outside," tripped on a blanket, and they both fell to the floor. He ran outside for help and told M.H.'s daughter to call 911. He was already covered in blood. "And I ran back in and I was trying to hold pressure on the wound and [M.H.'s child] ran out with the phone in her hand. And [M.H.'s child] was on the phone with 911 and that's when she gave the phone to me because she didn't know what to say…."

Defendant talked to the 911 operator and reported what happened. M.H.'s mother told him that she saw the ambulance drive around the block twice without stopping. Defendant told M.H.'s child to keep pressure on the wound, and he headed to the street to find the ambulance because he thought M.H. was "bleeding out." Defendant was covered in blood and distraught. "My whole wife-beater – my tank top was completely soaked."

Defense counsel asked if he recalled speaking to Deputy Coghlan. Defendant said he ran out to look for the ambulance and "jumped in front of Deputy Coghlan's car." Defendant testified Coghlan "asked me where the girl was at. I said she's inside," and asked where the ambulance was. Coghlan said it was coming. "So that's when the other deputy had me sit on the hood of his car and he spoke to me for a minute."

8.

Defendant did not remember the name of the deputy who detained him, but that deputy asked what happened.[4] Defendant said he threw a knife at M.H. and it was at the foot of the bed, and Coghlan went inside and retrieved it. Defendant never said he threw a phone.

Defendant was interviewed by Deputy Weimer later that day, and he was still wearing his blood-soaked clothes. He was scared, worried, and emotional during the interview. Weimer moved his handcuffs from the back to the front of his body and gave him water. Weimer did not threaten him and spoke to him in a cordial manner.

Defendant testified that he never intended to throw the knife at M.H. but intended to throw it at the wall behind her. He felt bad about what happened, but admitted he threw the knife on purpose, and knew it was sharp and could seriously injure or kill someone.

## PROCEDURAL BACKGROUND

**The Complaint**

On September 30, 2019, a complaint was filed in the Superior Court of Kings County charging defendant with count 1, attempted premeditated murder of M.H. (§§ 664, 187, subd. (a)), with deadly weapon and great bodily injury enhancements.

On October 21, 2019, the court issued a pretrial protective order that prohibited defendant from contacting M.H.

On February 27, 2020, a first amended complaint was filed that charged defendant with count 1, attempted murder; count 2, assault with a deadly weapon; and count 3, willful infliction of a corporal injury, with deadly weapon and great bodily injury enhancements.

---

[4] It appears defense counsel and defendant mixed up the names of the responding deputies. Deputy Verhoeven initially encountered defendant, asked what happened, and detained him.

9.

On February 28, 2020, after the preliminary hearing, the prosecutor asked the court to hold defendant to answer on counts 2 and 3 and the attached enhancements, but not on count 1, attempted murder. The court agreed there was insufficient evidence of premeditation for count 1, and only held defendant on counts 2 and 3 and the enhancements.

**The Information**

On February 28, 2020, the information was filed that charged defendant with count 1, assault with a deadly weapon, a knife (§ 245, subd. (a)(1)), and count 2, willful infliction of a corporal injury resulting in a traumatic condition upon a cohabitant or someone with whom he was in a dating relationship (§ 273.5, subd. (a)).

As to both counts, it was alleged that defendant personally used a deadly or dangerous weapon, a knife (§ 12022, subd. (b)(1)); personally inflicted great bodily injury that caused M.H. to become comatose due to brain injury and suffer paralysis (§ 12022.7, subd. (b)); and personally inflicted great bodily injury on M.H. under circumstances involving domestic violence (§ 12022.7, subd. (e)).

**Trial and Verdict**

On October 25, 2021, defendant's trial began with jury selection and motions.

Prior to the case going to the jury, the court dismissed the deadly weapon enhancement as to count 1 (§ 12022, subd. (b)(1)) and the great bodily injury enhancements as to both counts (§ 12022.7, subd. (b)). The court denied defendant's motion for an acquittal.

On October 29, 2021, the jury found defendant guilty of count 1, assault by means of force likely to produce great bodily injury, and count 2, willful infliction of corporal injury on a cohabitant; and found true the section 12022.7, subdivision (e) great bodily

10.

injury/domestic violence enhancements for counts 1 and 2, and the section 12022, subdivision (b)(1) deadly weapon enhancement as to count 2.[5]

**Sentencing Hearing**

On December 2, 2021, the court conducted the sentencing hearing. Defense counsel requested imposition of the lower terms because defendant did not have a prior record.

The prosecutor stated that M.H. requested a 10-year protective order and asked the court to terminate the existing pretrial order. Defense counsel did not object to the request for the protective order.

M.H.'s sister addressed the court on M.H.'s behalf. She stated the incident had changed M.H. from being an independent person, to someone who was unable to speak and walk. After M.H. suffered the stroke, she had additional surgeries to remove a piece of her scalp because of brain swelling, and she was placed on feeding and breathing tubes. She was in Kaweah Delta Hospital for one month, transferred to a rehabilitation hospital in Modesto for another month, and then transferred to Fresno Community Hospital for physical, speech, and occupational therapy. M.H. was released from the hospital, but she was severely disabled, and her mother was her fulltime caregiver.

Defendant addressed the court and apologized. He said that it was a traumatic accident, it was not an intentional act, and it resulted from a lapse of judgment.

### *The Court's Findings*

The court found defendant was presumptively ineligible for probation under section 1203, subdivision (e)(4) because he willfully inflicted great bodily injury on the victim as found by the jury. There were no unusual circumstances to overcome that

---

[5] The information alleged defendant was charged in count 1 with assault with a deadly weapon in violation of section 245, subdivision (a)(1). The court and parties agreed to instruct the jury with CALCRIM No. 875, that defendant was charged in count 1 with assault by means of force likely to produce great bodily injury, also in violation of section 245, subdivision (a)(1).

presumption because he was an active participant in the commission of the crime, he threw the knife in the direction of the victim, and his prior performance on probation was unsatisfactory. The court further found defendant understood what happened because he apologized, he did not deny that he intentionally threw the knife, and only denied that he intended to harm the victim. The court found defendant posed a risk to the victim if not imprisoned.

The court stated that based on the jury's verdicts, the crimes involved great violence, great bodily harm, threat of bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness; that he was armed with or used a deadly weapon; and he demonstrated at trial how he threw the knife that showed he used a significant amount of force.

The court further found defendant engaged in violent conduct that indicated he was a serious danger to society, his prior performance on probation was not satisfactory, and he was released on electronic monitoring in 2018 and failed to comply with the terms of that release. There was one mitigating circumstance that defendant had a minimal prior record of criminal conduct.

The court stated it could impose consecutive sentences for counts 1 and 2, but instead it was going to impose concurrent sentences and stay the term for count 1 pursuant to section 654 because the two counts involved the same operative facts and occurred at the same time, place, and location.

The court found the midterm was appropriate, the lower term was not justified, and declined to impose the upper term. "The Court finds there [are] no facts which make this case any more or less serious than other crimes of the similar nature, but there is certainly a lack of mitigating facts to go to the lower crime, the lower offenses."

The court denied probation and sentenced defendant to an aggregate term of eight years, based on the midterm of three years for count 2, plus consecutive terms of four

years for the great bodily injury/domestic violence enhancement, and one year for the attached deadly weapon enhancement.

As to count 1, the court imposed the midterm of three years, plus four years for the great bodily injury-domestic violence enhancement, for a total of seven years, with the sentence to run concurrent to the term imposed for count 2; and stayed the entirety of the sentence for count 1 pursuant to section 654.

The court imposed a $300 restitution fine (§ 1202.4), stayed the parole revocation fine in the same amount (§ 1202.45), and reserved victim restitution (§ 1202.4, subd. (f)). It also imposed court facilities assessments of $60 (Gov. Code, § 70373), court operations assessments of $80 (§ 1465.8), and a domestic violence fine of $500 pursuant to section 1203.097.[6]

As will be discussed in part III, *post*, the court also issued a protective order pursuant to section 273.5, subdivision (j), prohibiting defendant from having any contact with M.H. for 10 years, and terminated the pretrial protective order that was issued on October 21, 2019.

On December 8, 2021, defendant filed a timely notice of appeal.

## DISCUSSION

### I.      Admission of Defendant's Pretrial Statements

Defendant contends the court erroneously denied his motion to exclude his pretrial statements to Deputy Weimer because he was never expressly asked to waive his constitutional rights, and any implied waiver was involuntary and the result of intimidation, coercion, and/or deception because Weimer downplayed and minimized the importance of his constitutional rights before he read the advisements.

---

[6] As correctly noted by defendant, this fine was not stated in the minute order or the abstract of violence. As will be discussed below, the court lacked statutory authority to impose this fine, and it will be stricken.

13.

**A.** *Defendant's Motion to Exclude*

At the start of trial, defendant filed a motion to exclude his pretrial statements to Deputy Weimer and argued he was not asked to, and did not expressly waive, his constitutional rights. Defendant asserted he was improperly interrogated without a valid waiver, and any implied waiver was involuntary because Weimer "downplayed the significance of [his] rights and treated the admonition as if it was really no big deal," and Weimer's "[t]rivializing" the advisements invalidated his alleged waiver pursuant to *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1237 (*Musselwhite*).

The People opposed the motion but did not file a written opposition.

Prior to the presentation of trial evidence, the court held an evidentiary hearing on defendant's motion pursuant to Evidence Code section 402.

**B.** *Deputy Weimer's Hearing Testimony*

Deputy Weimer was the only witness at the evidentiary hearing. Weimer testified that the interview occurred at the sheriff's department on the same day of the incident, about one hour after the initial dispatch in the case.

Deputy Weimer testified that another deputy transported defendant from the scene to the sheriff's office and placed him in a locked interview room. This deputy would have been armed and remained in or near the locked interview room until Weimer arrived.

Deputy Weimer testified that he met defendant for the first time in the locked interview room. Weimer intended to question defendant as part of the investigation into an assault with a deadly weapon.

When he conducted the interview, defendant and Deputy Weimer were both seated at a table, they were the only people in the room, and Weimer was the only person who questioned him.[7] Weimer's service weapon was in his hip holster, and he did not display

_____

[7] On appeal, defendant states that he was placed in a locked interrogation room with two armed officers – Deputy Weimer and his "supervisor." There is no evidence to

14.

or pull it out. Defendant's hands were initially restrained behind his back. Defendant had blood on his hands and possibly on his clothes.

Deputy Weimer testified that defendant was crying before the interview began, and Weimer made "accommodations" for his emotional condition. Defendant asked for water, and Weimer gave him a bottle of water. Weimer also moved defendant's handcuffs from the back to the front of his body, so that he was more comfortable and could reach the water bottle. Defendant said several times that he was concerned about M.H.'s condition. Weimer tried to assure defendant that M.H. was going to be alright.

Deputy Weimer testified that prior to reading the *Miranda* advisements, he tried to build a rapport with defendant by asking background questions like his name, address, and date of birth. At this point, he did not ask any questions about the incident or the investigation. After the background questions, defendant seemed more comfortable. This preliminary conversation lasted about five minutes.

Deputy Weimer testified that he wanted to build a rapport with defendant to make him comfortable before he started asking questions about the investigation.

> "[Defense counsel]. Are you taught that in interrogation school or interview techniques?
>
> "[Weimer].    So if you are asking if I'm taught that and that's the way we do every interview, no, that is not the way you necessarily do every interview. It's a read-the-need kind of situation. In this particular situation I knew that he had been emotional. And that is a way – instead of just immediately going in and essentially interrogating somebody when they are in that emotional state it is not going to work. And the reality is the purpose of my interview is to find out what happened. It's not simply to interrogate somebody. It is to get to the bottom of the facts of what happened. So when – in this particular case [defendant] was in an emotional state. And just being a person to him, being a human being to

support this assertion. As explained, Weimer testified that a deputy transported defendant to the interview room, and the general practice would have been for that deputy to "supervise" defendant until Weimer arrived. Weimer further testified that when the interview began, Weimer and defendant were the only people in the room, and only Weimer asked him questions.

him and having a conversation with him outside of, you know, what happened directly is a way to kind of, you know, hopefully help calm him down and essentially, you know, be able to get the facts that are necessary in the investigation.

"Q. Did you tell [defendant], quote, we're at the Sheriff's office, so I have to read your rights, okay? So I mean you've got handcuffs on, I have to do it okay? Why did you say it that way? [¶] [¶]

"[A]. I like to explain to people why I do what I do. And, essentially, that's why I told him that. [¶]

"Q. Do you feel that that statement downplayed his right to remain silent, at all?"

"A. No.

"Q. Why is that?

"A. I'm just simply telling him that I've got to read you your rights and this is why I'm going to do it. Because when you read *Miranda* to somebody, when you [M]*irandize* people, they automatically kind of tend to believe that they are in trouble. That may or may not be the case. But because he is in custody, which is one of the prongs of *Miranda*, I just kind of explain to them this is why I'm doing what I'm doing."

Deputy Weimer testified the purpose of building a rapport was not to put defendant "at ease that he's not under investigation."

"[Defense counsel]. [So what was the purpose again?

"A. To help put him at ease.

"Q. Does putting individuals that are being interrogated in relation to a criminal investigation, does putting them at ease help them or, from your experience, are they more willing to give statements?

"A. Absolutely. [¶] … [¶]

"Q. What was the purpose of interviewing him? Was it really to get to the bottom of it or was it because he was under investigation for a criminal act?

16.

"A.     It's to obtain facts throughout and to assist in the investigation."[8]

Deputy Weimer testified that he next read the *Miranda* advisements to defendant, verbatim from a department-issued card. He asked defendant if he understood his rights, and defendant said yes. Weimer did not ask defendant if he would give a statement, but instead started to ask questions about the incident and defendant answered them. Weimer believed defendant acted in a way that showed he waived his rights because he answered questions.

Deputy Weimer testified that defendant was both calm and emotional during the interview. There were times when defendant had crying episodes that lasted 15 to 30 seconds. When this happened, Weimer stopped questioning defendant, allowed his emotions to pass, and did not resume the interview until he become calm again. Weimer used a normal tone of voice, never raised his voice, and tried to maintain a calm environment during the interview.

Deputy Weimer testified the interview lasted about 30 minutes, and defendant never asked for a break. Weimer did not threaten, pressure, or make any promises to defendant during the interview.

### C.     *The Transcript of the Pretrial Interview*

The parties agreed to admit the transcript of Deputy Weimer's interview with defendant only for purposes of the evidentiary hearing.[9]

---

[8] Defense counsel started to ask Deputy Weimer about how to determine whether a suspect has been detained. The court interrupted and said there was no question that defendant was detained since he was already in handcuffs and placed in a police car.

[9] The evidentiary hearing began with Deputy Weimer's testimony. The parties argued the motion, and defense counsel started to quote from the transcript of the pretrial interview as part of his argument. The prosecutor objected because the transcript had not been introduced into evidence. The court and the parties agreed to admit the transcript for purposes of the evidentiary hearing, and defense counsel recalled Weimer to the stand for further examination.

During trial, the prosecutor stated that she would only rely on Deputy Weimer's trial testimony as evidence of defendant's pretrial statements and would not introduce the video or the transcript. At trial, Weimer's testimony was the only evidence admitted

17.

According to the transcript, defendant asked for water at the beginning of the interview and asked about M.H.'s condition. Deputy Weimer replied she was "gonna [*sic*] be alright" and said he would grab some water. Weimer said he would move defendant's handcuffs to the front of his body, asked defendant if he would cooperate as he did that, and defendant said yes.

> "[Weimer]    Okay, here's the deal listen. Listen okay, it seems like this is a lot bigger than it really is right? So I'm just gonna talk to you and we'll get this, we'll get this done okay? I need you to go ahead and stand up for me, go ahead and face the wall, I'll take those cuffs, put 'em on in the front for ya.

> "[Defendant] I just want her to be okay dude.

> "[Weimer]    She'll be alright man, she's gonna be alright."

Weimer moved his handcuffs to the front of his body and had him sit down again.

Deputy Weimer asked defendant to confirm and spell his name and asked for his birthdate, address, height, color of his eyes and hair, and telephone number. Defendant answered the questions, gave his address as the East Sixth Street residence where the police had responded that day, and gave a telephone number with an out-of-state area code. Weimer asked where that area code was from. Defendant said it was Texas, and added, "I just had to pick a number, so I picked a number." Weimer asked if he picked a random number, and defendant said yes. Weimer asked if he was from Texas, and defendant said no.

Deputy Weimer then turned to the *Miranda* advisements:

> "[Weimer]    Okay. Obviously you're sitting here in handcuffs, right?

> "[Defendant] Yeah.

---

about defendant's pretrial statements, and his testimony was limited to the subjects as set forth in the factual statement above. The video and transcript were not introduced at trial, and the transcript was only used to refresh Weimer's recollection when he testified.

18.

"Q    At the Sheriff's Office so I have to read you your rights okay, so I mean you got handcuffs on, I have to do it okay.

"A    Yeah.

"Q    You have the right to remain silent, anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you if you're being questioned. If you can't afford a lawyer one will be appointed to you free of charge before any questioning if you want. *Do you understand that?*

"A    *Yeah*." (Italics added.)

Deputy Weimer then asked defendant if he lived with anyone on East Sixth Street. Defendant said he lived there with M.H., and her two children, and her mother lived in the adjacent house.

"Q    Okay. So … my name is Sam I'm a Deputy here at the Sheriff's office okay so, basically why I'm here is I just … want to get to the bottom of what's going on tonight okay? Um, to hopefully it will put you in a little bit of ease, [M.H. is] gonna be alright okay? So, kind of explain to me what happened today?

"A    We were arguing and she told me, she told me that she didn't want to me to be there anymore. So I was like fine, and then my mom had just bought us sheets and like the sheet that we been looking for forever."

Defendant said he was acted like "an ass," told M.H. he was going to cut the sheets and took her knife from the nightstand. M.H. yelled to give the knife to her. Defendant said, "[F]ine, so I folded it and I threw it at the wall. I don't know if it didn't shut or what but, I guess it hit her …."

According to the transcript, the interview continued with Deputy Weimer asking clarifying questions and defendant giving narrative answers, consistent with Weimer's trial testimony about his statement. Weimer never made any promises or threats to defendant during the interview.

At the end of the interview, defendant said: "I assume I'm under arrest, I assume." Weimer confirmed he was under arrest, they were still investigating at the house and sorting things out, and said he appreciated defendant's honesty.

19.

### D.    *The Parties' Arguments at the Hearing*

Defense counsel argued defendant's pretrial statements should be excluded and any implied waiver was invalid and coerced because defendant was handcuffed, placed in a locked room, he was not free to leave, the interview occurred shortly after the crime, defendant was in blood-stained clothes and crying, and Deputy Weimer tried to build trust and downplayed the *Miranda* advisements by saying that he "had to" give them, so that defendant would not assert his constitutional right to remain silent. Defense counsel argued this case was similar to *Musselwhite*, *supra*, 17 Cal.4th 1216 because Weimer used the same type of prohibited interview techniques of building trust, downplaying the importance of the *Miranda* advisements, and resuming questioning.

The court stated *Musselwhite* held the officer in that case did not misrepresent the constitutional advisements and there was no *Miranda* violation.[10] Defense counsel replied this case was different from *Musselwhite* because Deputy Weimer further downplayed the *Miranda* advisements by saying that "I have to read you your rights," and then directly went into questioning without an express waiver. Defense counsel argued that after Weimer "downplayed" the importance of the *Miranda* advisements, he should have expressly asked defendant if he agreed to waive his rights and give a statement. Counsel asserted that courts look on implied waivers "with suspect eyes" under these circumstances.

---

[10] Defense counsel repeatedly relied on *Musselwhite* during the evidentiary hearing, and argued it supported his arguments that Deputy Weimer "downplayed" the importance of the *Miranda* advisements so that any implied waiver was involuntary and coerced.

As will be further discussed below, *Musselwhite* acknowledged that "evidence of police efforts to trivialize the rights accorded suspects by the *Miranda* decision – by 'playing down,' for example, or minimizing their legal significance – may *under some circumstances* suggest a species of prohibited trickery and weighs against a finding that the suspect's waiver was knowing, informed, and intelligent." (*Musselwhite, supra*, 17 Cal.4th at p. 1237, italics added.) *Musselwhite* further held that the "slender" evidence in that particular case did not "approach that standard" and declined to exclude the defendant's statements. (*Ibid*.)

The prosecutor replied that Deputy Weimer read the *Miranda* advisements to defendant verbatim from a card and in plain language. Defendant expressly stated he understood his rights and "voluntarily elected to provide information with a clear implied waiver present through his conduct." While defendant was emotional, the totality of the circumstances showed that his free will was not overcome, and his waiver was not involuntary. Weimer treated defendant like a "human being," he made him comfortable, remained calm, did not intimidate defendant or make any threats, and the interview only lasted 30 minutes. While defendant was handcuffed and in custody, that triggered the requirement for *Miranda* advisements, and defendant was properly advised and waived his rights.

Defense counsel replied that Deputy Weimer's statements to defendant were designed to make him to believe he was not under investigation, which is prohibited by *Musselwhite*. The prosecutor again argued that placing a suspect at ease was different from tricking the suspect by telling him that he was not under investigation, and Weimer did not trick defendant. It was clear that defendant was under investigation, he was handcuffed inside a locked room, and he was not free to leave.

### E.   *The Court's Denial of Defendant's Motion*

The court denied defendant's motion to exclude his pretrial statement. The court stated that defendant was clearly in custody, and this case involved an implied waiver and not an express waiver. The court reviewed *Musselwhite* and noted that it rejected the claim of "police trickery," found no evidence that the officers lied, gave the suspect a false sense of security, or said he was free of suspicion, and held the defendant's statements in that case were properly admitted.

The court held the facts in *Musselwhite* were very close to this case and found defendant's implied waiver was valid, his waiver and statements to Deputy Weimer were not involuntary, his will was not overcome, and Weimer did not degrade the advisements as a technicality. Defendant stated he understood his rights and then implicitly waived

21.

his rights by answering questions. The court also found Weimer's initial background questions to place defendant at east did not violate *Miranda*.

### F. *Custodial Interrogation and Miranda Advisements*

On appeal, defendant argues his pretrial statements should have been excluded because Deputy Weimer engaged in "coercive tactics" and "downplayed" the importance of the *Miranda* advisements, so that any implied waiver of his constitutional rights was involuntary because of his "extremely vulnerable emotional state."

"As a prophylactic safeguard to protect a suspect's Fifth Amendment privilege against self-incrimination, the United States Supreme Court, in *Miranda,* required law enforcement agencies to advise a suspect, before any custodial law enforcement questioning, that 'he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.' " (*People v. Martinez* (2010) 47 Cal.4th 911, 947.)

"If the suspect knowingly and intelligently waives these rights, law enforcement may interrogate, but if at any point in the interview he invokes the right to remain silent or the right to counsel, 'the interrogation must cease.' " (*People v. Martinez*, *supra*, 47 Cal.4th at p. 947.)

"To establish a valid *Miranda* waiver, the prosecution bears the burden of establishing by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary under the totality of the circumstances of the interrogation." (*People v. Linton* (2013) 56 Cal.4th 1146, 1171.) "As well, '[b]oth the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial.' [Citations.] As with *Miranda* waivers, the People bear the burden of establishing by a preponderance of the evidence the voluntariness of a confession." (*People v. Duff* (2014) 58 Cal.4th 527, 551.)

"In reviewing the trial court's denial of a suppression motion on *Miranda* and involuntariness grounds, ' " 'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' " ' [Citations.] Where, as was the case here, an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review." (*People v. Duff, supra*, 58 Cal.4th at p. 551.)

### 1. Analysis

It is undisputed that defendant was in custody during the interview with Deputy Weimer. He had been placed in the patrol car at the scene, transported to the sheriff's department in handcuffs, and placed in a locked interview room under the supervision of an armed deputy. When Weimer arrived, he moved defendant's handcuffs from the back to the front of his body, but defendant remained handcuffed and in the locked interview room during the 30-minute interview.

With this background in mind, we review what happened when Deputy Weimer started talking to defendant, and whether his waiver and pretrial statements were coerced and involuntary.

### G. *Pre-Miranda Statements*

We begin with Deputy Weimer's statements and questions to defendant at the beginning of the interview, before he advised defendant of the *Miranda* warnings.

As noted above, "[t]he prophylactic *Miranda* protections are triggered only if a defendant is subjected to a custodial interrogation." (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 86 (*Andreasen*).) "The phrase 'custodial interrogation' is crucial. The adjective encompasses any situation in which 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' [Citation.] The noun 'refers not only to express questioning, but also to any words or actions on the part

23.

of the police … that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " (*People v. Mickey* (1991) 54 Cal.3d 612, 648; *Andreasen, supra,* 214 Cal.App.4th at p. 86.)

"However, not all police questioning of a person in custody constitutes interrogation." (*Andreasen, supra,* 214 Cal.App.4th at p. 86.) "Law enforcement officers may speak freely to a suspect in custody provided ' "the speech would not reasonably be construed as calling for an incriminating response." ' " (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1086–1087 (*McCurdy*).) An objective test is used to determine whether questioning qualifies as interrogation to require the *Miranda* advisements. (*People v. Elizalde* (2015) 61 Cal.4th 523, 536–537.)

"[C]asual conversations or 'smalltalk' unrelated to the offense do not typically constitute a *Miranda* interrogation." (*Andreasen, supra,* 214 Cal.App.4th at p. 87.) However, "the facts of any routine questioning or casual conversation must be carefully scrutinized to ensure that the police are not using the communication as a pretext for eliciting incriminating information." (*Id.* at p. 88.)

An officer's initial exchange with a defendant to "establish a rapport" is likewise permissible if not reasonably likely to elicit an incriminating response from the suspect. (*McCurdy*, *supra*, 59 Cal.4th at p. 1088.) If such an exchange was "likely designed to establish a rapport" with a custodial defendant and was successful in doing so, "this does not establish that defendant's free will was overborne." (*Ibid.*) Examples of legitimate "rapport building" have included questions about a suspect's background and interests. (*Id.* at pp. 1081, 1087 [inquiries regarding suspect's "upbringing, his decision to join the Navy, and his hobbies" held permissible "to establish a rapport"]; *People v. Gamache* (2010) 48 Cal.4th 347, 384, 388 [neutral questions regarding suspect's military experience did not constitute interrogation].)

*Miranda* advisements also are not required for routine booking questions, defined as "basic identifying biographical data necessary for booking or pretrial services,"

24.

including the suspect's name, address, height, weight, date of birth, and age, unless the police should know particular questions are " 'reasonably likely to elicit an incriminating response.' " (*People v. Elizalde, supra,* 61 Cal.4th at pp. 538, 540; *Pennsylvania v. Muniz* (1990) 496 U.S. 582, 601–602; *Andreasen, supra,* 214 Cal.App.4th at p. 87.)

### 1. Analysis

Defendant argues that prior to advising him of the *Miranda* warnings, Deputy Weimer used "coercive tactics to get [defendant] comfortable and talking…." We do not find that, individually or collectively, Weimer's pre-*Miranda* statements and questions served to overbear defendant's will or to render his subsequent waiver and admissions involuntary. (See, e.g., *People v. Krebs* (2019) 8 Cal.5th 265, 303–304.)

First, as demonstrated by the transcript of the interview, Deputy Weimer's pre-*Miranda* exchanges with defendant were directed to checking on his comfort in the interview room – responding to his request for water, moving the handcuffs from the back to the front of his body so he could drink the water, and advising him that he was going to ask some questions. Weimer's engagement in casual conversation and small talk to establish a rapport with defendant, even though he was in custody, were not reasonably likely to elicit an incriminating response, did not amount to coercive practices, and did not constitute a pretext for eliciting incriminating information. (*Andreasen, supra,* 214 Cal.App.4th at pp. 86–88.)

In addition, Deputy Weimer's initial questions to defendant were limited to routine booking inquiries, and he did not ask anything about what happened in the garage. Weimer did not engage in any systematic questioning about the incident prior to giving the *Miranda* advisements, and there is no evidence Weimer engaged in the prohibited practice of "question first, warn later" intended to improperly elicit a pre-*Miranda* confession, such that a subsequent *Miranda* warning would have been ineffective. (See, e.g., *Missouri v. Seibert* (2004) 542 U.S. 600, 616; *People v. Krebs, supra,* 8 Cal.5th at pp. 308–310.)

We note that when Deputy Weimer asked defendant for his telephone number, defendant responded with an out-of-state area code. Weimer asked where that area code was from. Defendant said it was for Texas and added, "I just had to pick a number, so I picked a number." Weimer asked if he picked a random number, and defendant said yes. Weimer asked if he was from Texas, and defendant said no. Weimer's inquiries about the area code were neutral follow-up questions to confirm answers given by defendant, and Weimer was recording the correct telephone number; the questions themselves were not reasonably likely to elicit an incriminating response or the basis for further questions about the investigation. (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 22–23.) Indeed, defendant voluntarily stated he picked the number at random. In any event, Weimer did not rely on defendant's decision to give an apparent false telephone number as the basis for further post-*Miranda* questioning to elicit a confession, and this exchange was not introduced at trial. (Cf. *Missouri v. Seibert, supra,* 542 U.S. at p. 616; *People v. Krebs, supra*, 8 Cal.5th at pp. 308–310.)

### H. *Musselwhite and the Validity of Miranda Advisements*

Defendant acknowledges that Deputy Weimer read the entirety of the *Miranda* advisements to him but argues Weimer "downplayed [his] *Miranda* rights before reading them" and deceived defendant "into believing the police interrogation was not a big deal and that it was just a way for him to make sure his girlfriend would be okay – when the reality was that he was under investigation for committing a very serious crime."

At the evidentiary hearing, defendant exclusively relied on *Musselwhite*, *supra*, 17 Cal.4th 1216 in support of these same arguments but has not cited that case in his appellate briefing. Nevertheless, *Musselwhite* is dispositive of his assertions.

In *Musselwhite*, *supra*, 17 Cal.4th 1216, defendant argued his *Miranda* waiver was invalid because detectives misrepresented his constitutional rights and suggested the *Miranda* advisements "were an unimportant 'technicality.' That representation, defendant claims, misled him into devaluing the importance of the rights conferred on

26.

criminal suspects by the Supreme Court's *Miranda* decision. Had he understood the value of remaining silent during police questioning and of requesting the assistance of an attorney, defendant argues, he would not have waived his *Miranda* rights." (*Musselwhite,* at p. 1237.) The defendant's arguments were based on "the following single brief statement, made by the interrogating detective immediately before advising defendant of his rights: " '… Well, we don't know what you know and what you don't know and so, what we'd like to do is just go ahead and advise you of your rights before we even get started and that way, that there's no problem with any of it. Is that alright with you?' " (*Ibid.*)

*Musselwhite* agreed "with the proposition that evidence of police efforts to trivialize the rights accorded suspects by the *Miranda* decision – by 'playing down,' for example, or minimizing their legal significance – may under some circumstances suggest a species of prohibited trickery and weighs against a finding that the suspect's waiver was knowing, informed, and intelligent." (*Musselwhite, supra*, 17 Cal.4th at p. 1237.) *Musselwhite* further held, however, that the "slender" evidence did not "approach that standard." (*Ibid.*)

> "Detective Bell's comment was not only required as a matter of constitutional law, but was an accurate statement of the office of the constitutionally derived *Miranda* warning, a 'prophylactic' against the danger of inculpatory statements by an uninformed suspect. [Citation.] Nor was the form Detective Bell's comment took objectionable; the required warning need not be given as a 'talismanic incantation.' [Citation.] As the trial court found after viewing the videotape of the questioning and hearing the suppression argument of defendant's lawyers, 'it is obvious that Mr. Musselwhite knew he was there to discuss the incident that occurred in the apartment house … he's placed into a room where he's … begun to be questioned by two detectives … he certainly would have taken it serious.… [¶] … He seemed to me to be taking it seriously.… [¶] [H]e was aware of all the implications of *Miranda*.' Last, of course, nowhere does Bell actually use the word 'technicality' or words to that effect.

"We agree. Given the brevity, as well as the accuracy, of Detective Bell's statement, the fact that the officers never described the *Miranda* warning as a 'technicality' or used similar words, the absence of similar comments during the course of the questioning, defendant's record of police encounters as evidenced by two prior felony convictions, the likelihood he was aware he was a suspect in a murder investigation (an awareness drawn from an unexpected police contact at his apartment and reflected in the several lies he told the officers when he was initially questioned), we conclude the record fails to support defendant's claim that the importance of his *Miranda* rights was misrepresented by the detectives and that he was thereby 'tricked' into waiving them." (*Id*. at pp. 1237–1238.)

In *People v. Johnson* (2010) 183 Cal.App.4th 253, 290 (*Johnson*), the defendant argued that her implied waiver of the *Miranda* advisements was invalid because the interviewing detectives allegedly minimized the significance of her rights, used deceptive tactics and false statements to get her to talk, and became aggressive and sarcastic to force her to talk. Her argument was based the detectives' statements made prior to giving the advisements, when they referred to the *Miranda* warnings "as 'clear[ing] a technicality,' describing the interview as a chance for [the detectives] to get answers, encouraging [the defendant] to talk freely and to ask any questions, not telling her the statements 'will' be used in court, and by not asking her if she wished to waive her rights." (*Id*. at p. 294.)

*Johnson* acknowledged *Musselwhite*'s warning that " 'evidence of police efforts to trivialize the rights accorded suspects by the *Miranda* decision – by "playing down," for example, or minimizing their legal significance – may under some circumstances suggest a species of prohibited trickery and weighs against a finding that the suspect's waiver was knowing, informed, and intelligent.' [Citation.] However, this is not that case." (*Johnson, supra*, 183 Cal.App.4th at p. 294.)

"The detectives did not misrepresent the significance of [the defendant's] rights. Referring to the process as clearing a 'technicality' and encouraging [the defendant] to talk and ask questions did not minimize the significance of her rights or the risks of her speaking with detectives. [The defendant] understood her rights and answered all of the detectives'

28.

questions with knowledge of her rights. She knew she was there to discuss a police case against [her codefendant], and an interrogation by a total of four detectives certainly conveyed the seriousness of the situation." (*Ibid*.)

*Johnson* concluded the defendant reasonably should have known the detectives were interested in her involvement in the crimes; she said she knew the detectives were talking to everybody about it; and she understood "the severity of the situation and the seriousness of the *Miranda* rights the detectives provided her." (*Johnson, supra*, 183 Cal.App.4th at p. 295.)

### 1. Analysis

Defendant's renewed arguments that Deputy Weimer "downplayed" the importance of the *Miranda* advisements, and that he was subject to a "coercive" environment, are meritless. As already explained, Weimer's brief pre-*Miranda* conversation with defendant was not coercive, did not constitute interrogation, and his limited inquiries were not reasonably likely to elicit an incriminating response.

Defendant's "downplaying" arguments are based on two brief exchanges that occurred at the beginning of the transcript of the interview. Just before he moved defendant's handcuffs from the back to the front of his body, Deputy Weimer told him that "it seems like this is a lot bigger than it really is right? So I'm just gonna [*sic*] talk to you and we'll get this, we'll get this done okay? I need you to go ahead and stand up for me, go ahead and face the wall, I'll take those cuffs, put 'em on in the front for ya." Defendant replied that he just wanted M.H. to be okay, and Weimer replied that she would be alright.

After he moved the handcuffs, Deputy Weimer asked the booking questions, and then the following exchange occurred:

> "[Weimer]    Okay. Obviously you're sitting here in handcuffs, right?
>
> "[Defendant] Yeah.
>
> "Q    At the Sheriff's Office so I have to read you your rights okay, so I mean you got handcuffs on, I have to do it okay.

29.

"A      Yeah."

As the trial court correctly found, *Musselwhite*, *supra*, 17 Cal.4th 1216 does not support defendant's arguments that Deputy Weimer coerced or misled him about the importance of the advisements. Weimer's brief statements to defendant did not trivialize, downplay, or minimize the legal significance of the advisements. Instead, as in *Musselwhite*, Weimer truthfully told defendant what he was constitutionally required to do – advise defendant of his constitutional rights because he was in handcuffs and at the sheriff's department, and he was going to be questioned about the incident in the garage. (*Id*. at p. 1238.) Weimer's statements were factually accurate, he did not minimize the significance of defendant's constitutional rights, he did not indicate those rights were not important, and did not engage in any type of trickery or deceit. Weimer never disparaged the advisements as mere technicalities or downplayed the importance of his constitutional rights. Also, as in *Musselwhite*, Weimer then fully and correctly read the *Miranda* advisements to defendant.

Defendant argues on appeal that Deputy Weimer further downplayed the importance of the advisements by telling him that his questions were "just a way for him to make sure his girlfriend would be okay – when the reality was that he was under investigation for committing a very serious crime," while assuring him that M.H. was going to be okay. We note that at the evidentiary hearing on the alleged *Miranda* violation, the defense did not argue that Weimer misrepresented M.H.'s condition in response to defendant's questions, that he knowingly made a false statement that she was going to be okay, or any alleged misrepresentation amounted to a coercive interview technique to undermine the advisement and waiver of the *Miranda* warnings.

In any event, there are several problems with defendant's appellate arguments on this point. At the evidentiary hearing, Deputy Weimer testified that his interview with defendant occurred within one hour of the dispatch in this case, and the interview only lasted 30 minutes. There was no evidence introduced at the evidentiary hearing about

30.

M.H.'s injuries, her course of treatment at the hospital, the timing and when that treatment occurred compared to the timing of defendant's interview, and, more importantly, whether Weimer was aware of what was going on at the hospital. Such evidence was limited to Dr. Kalani's testimony at trial.

Even if there had been evidence at the hearing consistent with the trial evidence about M.H.'s treatment and injuries, it would not support an argument that Deputy Weimer misrepresented M.H.'s condition. The trial evidence showed that M.H. was transported from the garage to Kaweah Delta Hospital, where she was treated by Dr. Kalani in the emergency room. Dr. Kalani testified that she could not determine the source of M.H.'s bleeding, but there were concerns about possible internal bleeding because of her low blood pressure. Dr. Kalani ordered CT scans to determine whether M.H. had suffered an internal head injury. Dr. Kalani reviewed the test results, they were negative for a head internal injury or a stroke, and M.H. was returned to the emergency room for further treatment. Dr. Kalani testified that when M.H. was back in the emergency room, they attempted to clean and suture M.H.'s ear injury, but she started to massively bleed and was rushed into surgery. It was only during the surgery that it was ultimately determined that the knife had penetrated four to five centimeters into her neck and damaged the jugular vein and carotid artery. Dr. Kalani testified they repaired the vascular damage and M.H. was stable after surgery, and when she again checked M.H.'s condition about four or five hours later. Dr. Kalani next saw M.H. as a patient about ten days later and learned she had suffered a stroke but did not know the date that happened.

Thus, even considering the trial evidence, an argument that Deputy Weimer intentionally misrepresented M.H.'s condition to defendant prior to advising him of the *Miranda* warnings, within the narrow time span when the interview occurred, would not amount to a coercive act or result in an invalid waiver because there was no evidence that Weimer was aware of what was going on at the hospital, or even if M.H.'s condition became more serious as the interview took place, since the trial evidence showed the

31.

seriousness of M.H.'s injuries was not apparent even to the treating surgeon until M.H. had been at the hospital for some time.

### I. *Validity of Waiver*

Finally, defendant asserts that any implied waiver of his rights was involuntary because he was in "an extremely vulnerable emotional state" at the beginning of the interview, and he was distraught, crying, covered with blood, and concerned about M.H.'s condition.

"… *Miranda* holds that '[the] defendant may waive effectuation' of the rights conveyed in the warnings 'provided the waiver is made voluntarily, knowingly and intelligently.' [Citation.] The inquiry has two distinct dimensions. [Citations.] First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." (*Moran v. Burbine* (1986) 475 U.S. 412, 421; *People v. Smith* (2007) 40 Cal.4th 483, 501–502.)

"[A] suspect who desires to waive his *Miranda* rights and submit to interrogation by law enforcement authorities need not do so with any particular words or phrases. A valid waiver need not be of predetermined form, but instead must reflect that the suspect in fact knowingly and voluntarily waived the rights delineated in the *Miranda* decision." (*People v. Cruz* (2008) 44 Cal.4th 636, 667.)

"[A] valid waiver of *Miranda* rights may be express or implied." (*People v. Cruz, supra*, 44 Cal.4th at p. 667.) "It is well settled that law enforcement officers are not required to obtain an express waiver of a suspect's *Miranda* rights prior to a custodial interview and that a valid waiver of such rights may be implied from the defendant's

words and actions." (*People v. Parker* (2017) 2 Cal.5th 1184, 1216.) "An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence." (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 384.)

"Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." (*Berghuis v. Thompkins, supra*, 560 U.S. at p. 384.) Similarly, "if a custodial suspect, having heard and understood a full explanation of his or her *Miranda* rights, then makes an uncompelled and uncoerced decision to talk, he or she has thereby knowingly, voluntarily, and intelligently waived them." (*People v. Cunningham* (2015) 61 Cal.4th 609, 642; accord, *People v. Krebs*, *supra*, 8 Cal.5th at p. 302; *People v. Parker, supra*, 2 Cal.5th at p. 1216.) "A suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights." (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 218–219; *People v. Gonzales* (2012) 54 Cal.4th 1234, 1269.)

"[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" (*North Carolina v. Butler* (1979) 441 U.S. 369, 374–375.) The prosecution's burden in this regard is simply to demonstrate, by a preponderance of the evidence, that the defendant understood the *Miranda* advisement and voluntarily chose to speak with law enforcement based on the totality of circumstances. (*People v. Duff*, *supra*, 58 Cal.4th at p. 551.)

### 1. Analysis

Deputy Weimer fully read the *Miranda* advisements to defendant and expressly asked if he understood his rights:

"Q     You have the right to remain silent, anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you if you're being questioned. If you can't

afford a lawyer one will be appointed to you free of charge before any questioning if you want. *Do you understand that?*

"A    *Yeah*."  (Italics added.)

There is no question that defendant "heard and understood a full explanation" of his rights.  (*People v. Parker*, *supra*, 2 Cal.5th at p. 1216; *People v. Krebs, supra*, 8 Cal.5th at p. 302.)  Deputy Weimer expressly asked defendant if he understood his rights, and defendant said yes and did not ask any questions or for an attorney.  Instead, he demonstrated his willingness to talk about what had just happened in the garage.  "Likewise, there is no dispute that defendant spoke to [Deputy Weimer] – and so 'act[ed] in a manner inconsistent' with the exercise of his *Miranda* rights.  [Citation.]  After being apprised of his rights, defendant 'proceeded to actively participate in the conversation with [Weimer] – answering questions, asking for clarification, and generally contributing to a discussion he knew was being tape-recorded.'  [Citation.]  He did not once mention an attorney.  Such conduct suggests that defendant 'has made a deliberate choice to relinquish the protection those rights afford.' "  (*People v. Krebs,* at pp. 302–303.)

Nevertheless, defendant asserts that "[d]espite being [in] such an emotional state, [defendant] was placed in a locked room *with two armed police officers* – with his hands cuffed behind his back and with his body and clothes covered in blood….  [Defendant] was not even given any opportunity to clean up and change his clothes."  He further asserts Deputy Weimer used "police tactics" and "preyed" on defendant's "extremely vulnerable emotional state in order to get [him] to implicitly waive his *Miranda* rights."

As previously noted, defendant's claim that he was in the locked interrogation with two armed officers is refuted by the record of the evidentiary hearing.  Deputy Weimer testified, without contradiction, that a deputy transported defendant to the interview room, and the general practice would have been for that deputy to "supervise" defendant until Weimer arrived.  Weimer further testified that he first met defendant when he entered the locked interview room, Weimer and defendant were the only people in the room, and only Weimer asked him questions.

34.

Defendant's claims that he was in an alleged "coercive" environment because he was handcuffed in a locked interview room, are based on the same indicia that establish he was in custody and had to be advised of the *Miranda* warnings before he could be questioned about what happened in the garage. " '[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." (*Howes v. Fields* (2012) 565 U.S. 499, 508–509; *People v. Johnson* (1992) 3 Cal.4th 1183, 1224.) Indeed, *Miranda* requires the advisement of constitutional rights prior to custodial interrogation because "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." (*Miranda, supra*, 384 U.S. at p. 467.) Defendant's status of being handcuffed and questioned in a locked room did not add a level of coercion beyond that inherent in a custodial environment.

As for the condition of his clothing and his show of emotion, a waiver in a similar situation was found to be knowing and voluntary in *People v. Farnam* (2002) 28 Cal.4th 107, where the defendant was in custody and interviewed in a small room the morning after he was arrested, the officer read the *Miranda* advisements, and the defendant indicated he understood his rights and waived them. (*Farnam*, at pp. 181–182.) Thereafter, the officer interrogated the defendant in "a quiet and nonjudgmental manner" for approximately two and one-half hours." (*Id*. at p. 182.) "Although [the] defendant was emotional when interviewed (sometimes crying or being very quiet), he never indicated any desire to have an attorney, to be left alone, or to discontinue questioning." (*Ibid*.)

At the evidentiary hearing in this case, Deputy Weimer testified there was blood on defendant's hands and possibly on his clothes; there was no evidence that defendant was cut or injured during the incident in the garage. Weimer testified there were times during the interview when defendant became emotional and had crying episodes that

lasted 15 to 30 seconds. When defendant became emotional, Weimer stopped questioning him, allowed his emotions to pass, and did not resume the interview until he become calm again. In this case, as in *Farnam*, defendant's emotional state did not undermine the voluntariness of his implied waiver and statements. While defendant may have been upset, there is nothing in the record to indicate that he was so distressed that he was unable to appreciate the *Miranda* admonitions that had been read to him or undermine the voluntariness of his waiver and his statements.

Based on our independent review of the record, we find Deputy Weimer's initial pre-*Miranda* exchanges with defendant did not constitute interrogation. Weimer properly advised defendant of the *Miranda* warnings, and he did not minimize or downplay the advisements as mere technicalities. Defendant impliedly waived his rights; his waiver was not the result of any intimidation, coercion, or deception, that occurred before, during, or after the *Miranda* advisements, and his statements were voluntary. The court correctly denied defendant's motion to exclude his pretrial statements.

## II.     Assembly Bill No. 518 and Section 654

Defendant contends the matter must be remanded for resentencing because of the subsequent enactment of Assembly Bill No. 518 (2021–2022 Reg. Sess.) (Assembly Bill 518) that amended section 654, and the court should be permitted to exercise its discretion as now authorized by the amended statute. The People agree remand is required, and it will be so ordered.

### A.     *Background*

At the December 2021 sentencing hearing, the court sentenced defendant to an aggregate term of eight years for count 2, willful infliction of a corporal injury. It imposed a concurrent term of seven years for count 1, assault with force by means likely to produce great bodily injury and stayed the entirety of the sentence for count 1, pursuant to section 654.

**B.** *Section 654*

Section 654 precludes multiple punishments for a single act or indivisible course of conduct. (*People v. Hester* (2000) 22 Cal.4th 290, 294.) At the time of defendant's sentencing hearing, section 654, subdivision (a) stated in pertinent part: " 'An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides *for the longest potential term of imprisonment*, but in no case shall the act or omission be punished under more than one provision.' " (*People v. Hester,* at pp. 294–295, italics added.)

Effective January 1, 2022, Assembly Bill 518 amended section 654 so that it now provides, in relevant part, "An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision…." (§ 654, subd. (a), italics added.) As a result, the trial court is no longer required to punish under the longest possible term of imprisonment when multiple offenses are based on the same act or omission. (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.) The amendments enacted by Assembly Bill 518 are retroactive to cases still pending on appeal. (*Ibid*.; *People v. Sek* (2022) 74 Cal.App.5th 657, 673.)

Defendant contends, and the People concede, that the amendments to section 654 are retroactive and applicable to defendant's case since it is not yet final on appeal, and that defendant's sentence must be vacated, and the matter remanded for the court to reconsider its application of section 654 under the amended statutory language. We agree and the matter will be so remanded.

**III.    The Domestic Violence Protective Order**

While the sentence will be vacated, we will address defendant's additional issues for guidance on remand.

As noted above, the court issued a protective order at the sentencing hearing, that prohibited defendant from having any contact with M.H. for 10 years. Defendant

contends that while the court was statutorily authorized to issue a postconviction domestic violence protective order under section 237.5, subdivision (j), the statute only authorized "a prohibition against contact, and nothing more," and the court lacked any authority to include "stay-away" provisions in the order, for defendant to stay 100 yards away from M.H., her residence, and her place of employment, and this language must be stricken.

**A.** *Background*

On October 21, 2019, after the complaint was filed, the court issued a pretrial protective order that prohibited defendant from contacting M.H.

On December 2, 2021, at the sentencing hearing, the prosecutor stated that M.H. requested a 10-year protective order and asked the court to terminate the existing pretrial order. Defense counsel did not object to the request for the protective order.

After the court imposed the prison term, it terminated the pretrial protective order, and issued and served defendant with a new domestic violence criminal protective order that prohibited contact with M.H. for 10 years, pursuant to section 273.5, subdivision (j). The court read the provisions to defendant:

> "You may not harass, follow, stalk, molest, destroy, or damage the real and personal property, disturb the peace, block the movements of the protective party in this case [M.H.]. You may not own, possess, buy, or try to receive, or otherwise buy a firearm or ammunition. You must surrender to local law enforcement or sell to or store with a licensed gun dealer any firearm owned by you within 48 hours after service of this order. And you must file a receipt with the court showing compliance with this order within 48 hours of receiving this order.

> "You must have no personal, electronic, or telephonic or written contact with the protected party. You must have no contact with the protected party named through a third party, except your attorney of record. So you cannot contact somebody else and have them contact her unless it is your attorney of record.

> "*You must not come within 100 yards of the protected party. And if you try and make any communication with the protect party in violation of the Court's order, that protected party may record the prohibited*

*communication by you, which can be used against you later. The … stay away is going to apply not only for the individual, but her residence or place of employment*." (Italics added.)

**B.** *Analysis*

On appeal, defendant asserts that section 273.5, subdivision (j) did not authorize the court to impose the "stay away" language as part of the protective order, as italicized in the paragraph above, because "the plain language" of the statute "is limited to ordering the restrained party from having contact with the protected party – and nothing more. Ordering the restrained party to stay 100 yards away from the protected party's residence or employment is *far more* than ordering the restrained party to have no contact with the protected party…. Therefore, a stay-away provision is not authorized by the plain language of the statute."

### 1.    Forfeiture

The People reply that defendant has forfeited appellate review of this contention because he did not object when the prosecutor requested the protective order or when the court issued it with the "stay-away" language.

The general rule is that only " 'claims properly raised and preserved by the parties are reviewable on appeal.' " (*People v. Smith* (2001) 24 Cal.4th 849, 852.) "A claim that a sentence is unauthorized, however, may be raised for the first time on appeal, and is subject to judicial correction whenever the error comes to the attention of the reviewing court." (*People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6.) "Appellate courts are willing to intervene in the first instance because such error is 'clear and correctable' independent of any factual issues presented by the record at sentencing." (*People v. Scott* (1994) 9 Cal.4th 331, 354.) Accordingly, appellate courts have considered a defendant's challenge that a no-contact or protective order was not statutorily authorized where the defendant did not object to the order during trial court proceedings. (*People v. Robertson* (2012) 208 Cal.App.4th 965, 996–997; *People v. Ponce* (2009) 173 Cal.App.4th 378, 381–382.)

In this case, defendant's appellate challenge to the protective order is premised on the trial court's alleged lack of statutory authority to impose the "stay-away" language, and thus he has not waived review of this argument.

### 2. Statutory Language

As to the merits, defendant was convicted in count 2 of violating section 273.5, subdivision (a) willful infliction of a corporal injury resulting in a traumatic condition upon M.H., a cohabitant or someone with whom he was in a dating relationship.

As applicable to that conviction, section 273.5, subdivision (j) states:

> "Upon conviction under subdivision (a), the sentencing court shall also consider issuing an order *restraining the defendant from any contact with the victim*, which may be valid for up to 10 years, as determined by the court. It is the intent of the Legislature that the length of any restraining order be based upon the seriousness of the facts before the court, the probability of future violations, *and the safety of the victim and his or her immediate family*. This protective order may be issued by the court whether the defendant is sentenced to state prison or county jail, or if imposition of sentence is suspended and the defendant is placed on probation." (Italics added.)

When interpreting a statute, we view the statutory enactment as a whole, consider the plain, common sense meaning of the language used in the statute, seek to effectuate the legislative intent evinced by the statute, and engage in independent review. (*People v. Delarosarauda* (2014) 227 Cal.App.4th 205, 210.) The validity of such a protective order is otherwise reviewed for an abuse of discretion. (See *S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, 1264.)

We note that similar language authorizing a protective order is contained in section 136.2, subdivision (i)(1), that states when a defendant has been convicted of a crime involving domestic violence, "the court, at the time of sentencing, shall consider issuing an order *restraining the defendant from any contact with a victim of the crime*." (§ 136.2, subd. (i)(1), italics added.)

40.

The plain language of both sections 273.5, subdivision (j) and section 136.2, subdivision (i)(1), permitting a trial court to restrain a defendant from *any contact* with the victim, is broad and encompasses "stay away" orders. (*Babalola v. Superior Court* (2011) 192 Cal.App.4th 948, 958 ["In 1996 Assembly Bill No. 2224 (1995–1996 Reg. Sess.) was passed to broaden the court's authority to issue ex parte no-contact and *stay-away orders* under the Domestic Violence Prevention Act. (Stats. 1996, ch. 904, § 1, p. 4989.)" (Italics added)].) The "stay away" provision was thus statutorily authorized by section 273.5, subdivision (j) as part of its protective order to prohibit defendant from having any contact with M.H., as a victim of the domestic violence conviction in this case and ensure "the safety of the victim and his or her immediate family." (§ 273.5, subd. (j).)

As a separate matter, the court did not abuse its discretion when it ordered defendant to stay at least 100 yards away from M.H., her residence, and place of employment, and the order was not unreasonable under the circumstances of M.H.'s condition, as reported by her sister at the sentencing hearing – that she was severely disabled, unable to speak and walk, and needed a fulltime caregiver. Defendant "has no 'right' to associate with those who shun him because of his past crimes against them." (*People v. Petty* (2013) 213 Cal.App.4th 1410, 1424.)

Thus, on remand, the court shall not strike the postconviction domestic violence protective order and the stay-away language included therein.

## IV.    The Domestic Violence Fine

At the sentencing hearing, the court stated it was imposing a domestic violence fine of $500 pursuant to section 1203.097; defendant did not object to this fine. As noted by defendant, this order was not stated in the minute order or abstract of judgment.

Defendant contends, and the People agree, the court lacked statutory authority to impose this fine and it must be stricken. A fine pursuant to section 1203.097,

41.

subdivision (a)(5)(A) only may be imposed when a defendant is "granted probation." (§ 1203.097, subd. (a)(5)(A); *People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1520.)

Defendant was not placed on probation and instead sentenced to prison. This fine was not statutorily authorized, and it must be stricken and shall not be reimposed at the sentencing hearing on remand.

## V. The Restitution Fine and Fees

As a separate issue from the domestic violence fine, defendant contends the court improperly imposed the $300 restitution fine, and the other fees and assessments of $140, without finding he had the ability to pay those amounts in violation of *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

We agree with the People that we need not address this issue since we are vacating the sentence and remanding the matter for another sentencing hearing. (See, e.g., *People v. Rosas* (2010) 191 Cal.App.4th 107, 117–121 [restitution and parole revocation fines are not a severable part of a judgment and are within scope of a remand for resentencing]); *People v. Buycks* (2018) 5 Cal.5th 857, 893 [explaining the " 'full resentencing' " rule]; *People v. Acosta* (2018) 29 Cal.App.5th 19, 26; *People v. Burbine* (2003) 106 Cal.App.4th 1250, 1257–1259.)[11]

## DISPOSITION

Defendant's pretrial statement was properly admitted.

The court was statutorily authorized under section 273.5, subdivision (j) to impose all provisions of the postconviction domestic violence protective order.

---

[11] In remanding the matter, we note that in *People v. Aviles* (2019) 39 Cal.App.5th 1055, we held that *Dueñas* was wrongly decided, and an Eighth Amendment analysis is more appropriate to determine whether restitution fines, fees, and assessments in a particular case are grossly disproportionate and thus excessive. (*Aviles*, at pp. 1068–1072.) We further note the sentencing hearing in this case was held nearly three years after *Dueñas* was decided, and defense counsel did not object to the court's imposition of the statutory minimum restitution fine and minimum fees and assessments, perhaps based on the determination that such an objection would have been futile. (See, e.g., *People v. Banner* (2022) 77 Cal.App.5th 226, 239.)

Defendant's sentence is vacated, and the matter remanded for another sentencing hearing on the issues raised by Assembly Bill 518's amendments of section 654, and further appropriate proceedings on the fines and fees as may be raised by defendant.

The section 1203.097 domestic violence fine of $500 is stricken and shall not be reimposed.

After the resentencing hearing, the court shall issue an amended abstract of judgment that omits the section 1203.097 domestic violence fine and reflects any other changes that may be made at the hearing. The court shall forward the amended abstract of judgment to all appropriate parties.


POOCHIGIAN, J.

WE CONCUR:


LEVY, Acting P. J.


DETJEN, J.

43.